DETROIT CITIZENS' STREET-RAILWAY CO. *v.* COMMON COUNCIL OF DETROIT.

| 125 | 673 |
|---|---|
| 126 | 43 |
| 125 | 673 |
| 127 | 606 |

| 125 | 673 |
|---|---|
| s85NW | 96 |
| s86NW | 809 |
| 184US | 386 |

| 125 | 673 |
|---|---|
| s85NW | 96 |
| s86NW | 809 |
| 131 | 6110 |

| 125 | 673 |
|---|---|
| 139 | 6 8 |

| 125 | 673 |
|---|---|
| e148 | ¹158 |

1. TAXATION—CASH VALUE—DISCRETION OF ASSESSOR — REVIEW.
   Where assessors and board of review act regularly and in good faith in fixing the cash value of taxable property, their determination will not be disturbed by the court.

2. SAME—CORPORATE FRANCHISES—NONTRANSFERABLE RIGHTS.
   The nontransferable rights possessed by all corporations to organize and exist as a corporation, and to act generally as such, are not deemed to have a "cash value," in the sense of the tax laws making such the basis of taxation; but the special privileges granted to them, which are not possessed by the individual under general laws, may be considered as having such a value in connection with the property adapted to their use.

3. SAME—STREET-RAILWAY PROPERTY—TRACK.
   Under a statute requiring the assessment of a street-railway "track" as personal property, not only the ties, spikes, rails, and switches, but the right to the use of the roadbed as well, should be construed as included within the term.

4. SAME—ASSESSMENT AS UNIT—VALUE AFFECTED BY FRANCHISE.
   In determining the cash value of a street railway for assessment purposes, the tangible property should be regarded as a unit, the value of which may be enhanced by reason of the special privileges which the corporation, under its franchise, is permitted to enjoy.
   125 MICH.—43.

5. SAME—SEPARATE ELEMENTS OF VALUE.

Assessors, in determining the value of a street-railway system *i. e.*, the unit representing the tangible property of the corporation, associated with its easement in the streets and other intangible property, are not required to place separate valuations upon the elements which go to make up the aggregate value of the unit.

6. SAME — CORPORATIONS — STATUTES — CONSTITUTIONAL LAW — DOUBLE TAXATION—UNIFORMITY.

The method provided by 1 Comp. Laws 1897, § 3842, for the assessment of corporate property, *i. e.*, by deducting the value of the real estate from the market value of the stock, and the indebtedness from the cash value of the personal property, and assessing as personalty the balances so found, is unconstitutional and void, as lacking uniformity with the usual methods, and as providing for double taxation.

7. SAME—EFFECT OF UNCONSTITUTIONALITY.

The failure of the special method prescribed by section 3842 does not relieve the property of corporations from taxation, but renders it taxable under section 3831, providing for the taxation of personal property in general.

8. SAME—DOCTRINE OF EJUSDEM GENERIS—APPLICATION.

The fact that no intangible property is mentioned among the classes of personal property which are declared taxable by 1 Comp. Laws 1897, § 3831, and that the general clause which follows declares merely that all other personal property not therein enumerated, and not exempt, shall be taxed, does not operate to exclude, through application of the doctrine of *ejusdem generis* in the construction of the general terms, the assessment of tangible property with reference to an enhancement of value due to its association with intangible property whatever might be the rule if the intangible property itself were sought to be assessed.

9. SAME — STREET RAILWAYS — SEPARATE TAXING DISTRICTS — DIVISION OF VALUE.

That a street-railway system consists of several power plants situated at different places along the line, which extends through or into several taxing districts, and also includes a plant outside the city, with which the city board of assessors has nothing to do, is no obstacle to the assessment of the property as a unit, as the legislature may require different portions to be assessed in different places, and a fair division

of its value may be made by a mutual understanding between the several assessors.

10. SAME—SPECIFIC TAXES — CORPORATIONS — GENERAL AND SPECIAL LAWS.

The constitutional requirement that private corporations shall be created under general laws only does not preclude the legislature from passing special laws authorizing a municipality to impose specific taxes upon corporations so created according to the particular circumstances attending each.

11. SAME—STREET RAILWAYS—ORDINANCES—IMPLIED REPEAL.

A corporation organized under the tram-railway act (2 Comp. Laws 1897, § 6394 et seq.), prior to the repeal of a provision of that act requiring such corporations to pay to the State a specific tax in lieu of all other taxes, operated for a time under an ordinance permitting it to occupy the streets on condition that it keep them in repair and pay an annual license fee to the city. Subsequently it agreed to an amendment whereby it was required to pay to the city, in lieu of the above-mentioned charges and license fee, an annual tax on its gross earnings, which agreement was in force at the time the specific-tax provision of the organic act was repealed. The city made the repeal a ground for claiming the right to ignore the existing contract, and, dissentions arising, a new arrangement was perfected, providing for an increased tax on gross receipts, the same to be "in lieu of license and other taxes and charges under existing ordinances." Held, that the city was bound by the terms of its contract, and could not impose an ad valorem tax.

12. SAME—ASSIGNABLE RIGHTS.

The right to pay a specific tax in lieu of all other city taxes, secured to a street-railway company under a contract with the city, is assignable to another company, under 2 Comp. Laws 1897, § 6448, authorizing such companies to purchase and use and enjoy other railways, and the rights, privileges, and franchises of the companies owning the same, just as the latter might have done.

13. SAME—ASSESSMENT—PROCESSES—RESULT.

While an assessment of a street-railway plant might be rendered invalid by the inclusion of an assessment placed on the naked franchise, disassociated from the tangible property, and irrespective of the cash value of the whole, processes by which the assessors arrive at value are immaterial, if only the conclusion represents their idea of the actual market value of the plant.

14. SAME—IRREGULARITIES—REVIEW—WAIVER.

A street-railway company which has contested its assessment before the board of assessors, and, on appeal, before the common council, on stated grounds which go to the merits, is not entitled, after all the meritorious questions have been resolved against it, to be heard on a supplemental appeal alleging only technical defects.

15. SAME—APPEALS—COMMON COUNCIL — DELEGATION OF POWERS —NOTICE OF HEARING.

While the common council of the city of Detroit has no right to delegate to a committee its functions as a board of review in the matter of assessments, it is not obliged to notify an appellant, who has been heard before its committee, to attend when it sits for the consideration of such appeals; it being the appellant's duty to be present and request a hearing if he desires one.

*Certiorari* to Wayne; Carpenter, Hosmer, Waite, Donovan, and Rohnert, JJ. Submitted November 16, 1900. Decided February 12, 1901. Rehearing denied July 2, 1901.

*Mandamus* by the Detroit Citizens' Street-Railway Company to compel the common council of the city of Detroit to set aside an assessment for taxes. From an order denying the writ, relator brings *certiorari*. Affirmed.

*Brennan, Donnelly & Van De Mark* (*Henry M. Duffield, H. H. Hatch*, and *John J. Speed*, of counsel), for relator.

*T. E. Tarsney* (*Allen B. Morse* and *George E. Nichols*, of counsel), for respondent.

HOOKER, J. The relator is a corporation organized and operating a street-railway trolley line in the city of Detroit. Its railway extends through several wards in the city, and into a township outside of the city. The assessment of values of property for taxation in Detroit is made by a city board, called the "Board of Assessors," its

action being subject to review by the common council. This board assessed the relator's property for the year 1900 at something over $5,000,000, its previous assessment having been $800,000 for the year 1898, and $1,500,000 for the year 1899; and the council, professing to act as a board of review, subsequently confirmed the assessment. On May 14, 1900, the relator filed a petition for *mandamus* in the circuit court, in which it prayed that the respondent, the common council, be required to strike the assessment from the rolls, or, in the alternative, that it be required to reconvene as a board of review, and strike from said assessment certain sums alleged to represent the value placed upon the franchises of the relator, and to place upon the rolls the personal property of the petitioner at the actual cash value of its tangible personal property subject to taxation. On the return of an order to show cause, issue was joined upon several questions of fact, and, after hearing the testimony, that court, sitting *en banc*, denied the relief prayed, and the relator has brought the case here.

The circuit court filed written findings of fact, based upon the issues, and an opinion discussing said findings and the law applicable to the case.

Four objections only, made by relator's protest filed with the board of assessors, were relied upon in the circuit court, as appears from the opinion:

"1. That the valuation placed on relator's taxable personal property greatly exceeds its true cash value.

"2. That there was illegally included in said valuation several million dollars on account of franchises.

"3. That no separation was made on the assessment roll of the valuation placed on the franchises and the valuation placed on the tangible personal property of relator.

"4. That the property acquired by relator from the Grand River Street-Railway Company is taxable, by virtue of a contract with the city, at 1 per cent. on its gross earnings, and is not otherwise subject to taxation for city purposes."

. The circuit court omitted to determine the first, *i. e.*, whether the valuation exceeded the cash value of the property, upon the ground that a court can only assume to control the judgment of an assessing officer in fixing values where said officer has acted fraudulently.

The disposition of the second is shown by the following question:

"In fixing the valuation of the personal property of the petitioner, did the board of assessors take into consideration and include the franchises of petitioner, and easements in the nature of franchises, in the streets of Detroit, acquired by petitioner from the Detroit City Railway, and owned and enjoyed by petitioner, as alleged in paragraph 8 of the petition?"

The court answered:

"Yes; they took into consideration the franchise in the streets of Detroit, as stated in the opinion."

Referring to the opinion for a more complete answer, we find it stated that "the franchise which was taken into consideration in valuing relator's personal property was its right to construct, maintain, and operate street railways in the streets of Detroit, and to collect fares from passengers carried thereon."

It appears to be conceded that there was no separation upon the roll of the valuation placed upon the franchises from that placed upon the tangible personal property, and that the property was assessed at some $2,000,000 more than the value of the track, rolling stock, etc., disassociated from the easement in the highway and its attendant privileges.

For the purpose of the discussion of the question before us, we will treat franchises as of three classes: *First*, the right to organize and exist as a corporation; *second*, the right to act generally as a corporation; and, *third*, the special privileges granted to it which are not possessed by the individual under general laws. See *Chicago Municipal Gas Light & Fuel Co.* v. *Town of Lake*, 130 Ill. 42, 43 (22 N. E. 616).

The first of these is enjoyed by all corporations legally formed, and also by all assuming to be corporations through user. This right to exist as a corporation is not transferable, and therefore cannot be said to have a cash value, in the sense of our statute. *Joy* v. *Plank-Road Co.*, 11 Mich. 164. Cash value and actual value are said to have the same meaning, viz., "the amount at which property would be estimated if taken in payment of a liquidated demand due from a solvent debtor." Welty, Assessm. § 130, and cases cited. The term is fixed, however, by our statute (1 Comp. Laws 1897, § 3850), which provides:

"The words 'cash value,' whenever used in this act, shall be held to mean the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale."

Apparently the intention was not to tax property having no cash value. If it *were* transferable, it would seldom be worth more than a nominal price, by reason of the facility with which such corporations may be organized under our general laws, which is the only way that private corporations can be created in Michigan. Const. art. 15, § 1.

Again, franchises of the second class are incident to all corporations, and are manifestly of no more value than the right to exist; for they naturally and impliedly go with it, and are not transferable. Every corporation has, by implication, authority to acquire and dispose of property, and to carry on business as a private person would do, for the purposes for which the corporation is organized. *Joy* v. *Plank-Road Co.*, *supra;* *Stone* v. *Trust Co.*, 116 U. S. 307 (6 Sup. Ct. 334, 388).

The third class consists of exceptional privileges — usually, if not always, connected with property—which the citizens generally do not enjoy, and these are frequently of much value. To apply what has been said to the relator: Any number of street-railway companies

might be organized under the statute, and they would have the right to exist as lawfully-constituted corporations, with the corporate capacity to build and operate street railways anywhere in the State. But the *right* to build would have to be acquired. Until such a corporation should be able to obtain an easement in some highway,—which the statute does not, of itself, effectuate,—its privileges would be of little, if any, value. But when it should have acquired possession of an easement in a designated highway, for the purposes of a street railway, and constructed and put in operation a railway thereon, the easement and railroad would constitute property.

It seems not to have been the policy of the State to place any price or tax upon the right to exist or act as a corporation until recently. Now a franchise tax is exacted from all newly-formed domestic corporations, as well as those of foreign States and countries which choose to do business within the State. This is in no sense a tax upon property. It is exacted but once, viz., when the company is organized or enters the State to do business, and, in short, is a condition upon which it is permitted to be and to act. The price of these privileges is proportionate to the capital employed. Whether the State might treat these franchises as property, and provide for their assessment on an *ad valorem* basis, we need not inquire. It has not been done, and there seems to be little inducement for such action, because of the trifling value of the abstract right of corporate existence.

Recurring to the third class, it is noticeable and suggestive that the State has not, in express and certain language, imposed a tax upon franchises as property upon an *ad valorem* basis. We are of the opinion that the reason is that there is no occasion for it. A fundamental idea in our organic law is equality of taxation. It requires uniformity of method, and prescribes the basis upon which property shall be taxed, viz., "its cash value." There is no more excuse for ascribing a fictitious value to property, whether tangible or intangible, than there is justice in

undervaluing or omitting it from the tax roll. We have attempted to show that special privileges are usually of little more than nominal value, except in connection with tangible property, which makes it possible for the owner—who may be a corporation or a natural person—to avail himself of them. Why, then, should they be taxed in the abstract, and when the owner can neither use them nor sell them? In *California* v. *Railroad Co.*, 127 U. S. 1 (8 Sup. Ct. 1073), it is said:

"The taxation of a corporate franchise merely as such, unless pursuant to a stipulation in the original charter of the company, is the exercise of an authority somewhat arbitrary in its character. It has no limitation but the discretion of the taxing power. The value of the franchise is not measured like that of property, but may be ten thousand or ten hundred thousand dollars, as the legislature may choose, or, without any valuation of the franchise at all, the tax may be arbitrarily laid. It is not an idle objection, therefore, made by the company against the tax imposed in the present case."

When, however, they are associated with property which makes them available, the property with which they are connected generally takes on a new form in the law, and is enhanced by the privileges and uses to which it is adapted and applied, and pays a correspondingly increased tax, because it has an increased cash value. Any other rule would be full of difficulty.

Private corporations are formed for an infinite variety of purposes, and the fewest of them enjoy exceptional privileges, beyond that of corporate existence. There is no reason for assessing the factory of a manufacturing corporation, the store of a mercantile company, or the farms of an agricultural corporation at a greater sum than similar property belonging to a private person is valued at. The problem is solved by assessing the property of each at its true cash value. Special privileges, unlike the right to corporate existence, have an actual value in connection with the property adapted to their use, and are salable with it. See *Joy* v. *Plank-Road Co.*, 11 Mich. 164; 2

Comp. Laws 1897, §§ 6426, 6448, 6449. The practice of taxing the property and the privilege together is nearly or quite uniform. It would be unjust to tax the property at its enhanced value, and also tax the franchise separately, upon some speculative value, arrived at upon the basis of real or imaginary expectancy of profits. Low taxes, fairly and evenly distributed, should be the aim, and the Constitution has fixed the rule of valuation at "the cash value," and, as we have seen, the statute has defined the term.

The relator contends that the personal property should be assessed upon the basis of the component parts of the railway system, i. e., a given price per mile for track and overhead construction, an average sum per car, and a certain sum for machinery, all bearing some relation to their cost or the price at which similar articles can be obtained. In fact, the relator claimed upon the hearing below that the tangible property was so valued, and that some $2,000,-000 or more was then added for the value of the franchise. The court set the matter at rest, however, by finding that, in fixing the value of the personal property, the assessors ook into consideration and included the franchise in the streets. The right to use the street for a railway is an easement. *Detroit Citizens' St. R. Co.* v. *City of Detroit,* 124 Mich. 449 (83 N. W. 104); *Providence Gas Co.* v. *Thurber,* 2 R. I. 15 (55 Am. Dec. 621); *People* v. *Cassity,* 46 N. Y. 49; *City of Grand Haven* v. *Grand Haven Waterworks,* 119 Mich. 655 (78 N. W. 890); *Rascher* v. *Railway Co.,* 90 Mich. 413 (51 N. W. 463, 30 Am. St. Rep. 447). This easement becomes a vested property right, and, while there may be a few cases holding that easements not held in fee cannot be separated from the fee for the purposes of taxation (see *City of Fall River* v. *County Com'rs of Bristol,* 125 Mass. 567; *City of Detroit* v. *Detroit City R. Co.,* 76 Mich. 427 [43 N. W. 447]), there are others which hold such an interest taxable as real estate, and the section cited (1 Comp. Laws 1897, § 3850), defining the term "cash value," also provides that "in determining the value the

assessor shall also consider the advantages and disadvantages of location, quality of soil, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value."

If, therefore, the easement were taxable as an interest in land, the nature of the easement, its location, uses, and productiveness, might, by the express terms of the statute, be taken into consideration in determining the cash value. The individuality of the elements of the road as chattels, i. e., spikes, rails, ties, poles, wire, etc., has become lost, as in other cases of fixtures, by being transformed into other property, the value of which is to be determined by relation to that kind of property, and not to spikes, ties, rails, etc., just as fine furniture is valued by comparison with similar articles, and not with similar materials to those entering into its construction.

It is obvious that the relator's property is worth much more as a street railway, equipped and in successful operation, than the elements which enter into its construction would be as second-hand railway material. It may be worth much more than what it would cost to reproduce the physical aggregation of property constituting such railway and its equipment, and circumstances might exist which would make it worth less. The propriety of treating aggregations of property as a unit is as natural and proper for the purposes of assessment as for sale, and this is especially so where the various articles are so essential to the purpose for which they are combined that the withdrawal of one or any class would destroy, or substantially impair, the use of all for the purposes to which in their new form they are adapted.

We may take judicial notice that the relator's street railway has a large market value, much in excess of any amount that could be obtained for the same if it were to be dismantled, and its rails, cars, motors, wire, etc., sold separately. In such a case it would practically go as junk. Again, the easement of a steam railroad in a con-

tinuous right of way through the State, over a desirable route, and in use, has a much greater value than the same kind of a right not in use, or in small, disconnected parcels, or in a remote region, where it cannot be used profitably. Manufacturing establishments and large buildings, favorably located and adapted to special uses, illustrate the same principle, and we think it is incorrect to say that the recognition of this principle, and its consideration in assessment, is taxing the good will of a business, which, like executory contracts, has not, usually, been thought to be taxable. *People* v. *Dederick*, 161 N. Y. 195 (55 N. E. 927); *Chittenden* v. *Witbeck*, 50 Mich. 401 (15 N. W. 526).

The legislature has provided that the track (whatever that may mean) shall be assessed as personal property. In our opinion, this term should be construed to include not only the ties, spikes, rails, and switches, but also the right to use the bed upon which they are placed. See *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 428 (43 N. W. 447). And although the bed, *i. e.*, the highway, is under the control of the public, and the right to use it is an easement and interest in land, the State may treat it as personal property for assessment, even if it would be otherwise considered real estate,—a proposition that we find it unnecessary to assert.

No good reason is suggested for assessing a street railway, or any other property, for less than it would readily sell for. This railroad has for years been assessed for a sum small in comparison with the assessment complained of, but if it be true that former assessments have not included the track, and have been based solely upon the value of certain items of construction, such assessments may have been much too low. The propriety of assessing such property as an entirety is well supported by authority. Mr. Elliott, in his work on Railroads, advocates it in the following language:

"The best method of taxing the property of a railroad company, forming part of its line and used in the operation

of its road, is by regarding it as a unit, and assessing the property as an entirety, since any other method would dissect the property into fragmentary parts, and lead to confusion and injustice. Some of the courts hold that the property can only be taxed as an entirety." 2 Elliott, Railroads, § 737, and note.

This subject was discussed in *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 220 (17 Sup. Ct. 305). That case was complicated by questions relating to interstate commerce, the corporate business extending into and over several States. Yet the court asserted the propriety of taxation by the States, and admitted the power to assess as a unit, and to levy taxes upon an aliquot part of such assessment valuation. The case is valuable also upon the question which we have before alluded to, viz., the elements which go to make up the aggregate value of the unit, and the doctrine was carried much further than is necessary in this case by applying it to an express company, which owned no easements, and had no special privileges that any private citizen does not enjoy, and whose only property consisted of articles in common use by individuals, but which, treated as a unit, were susceptible of being made the means of realizing enormous profits, and probably, as a whole, worth in the market much more than the integral parts of such unit, for the purpose of sale. Whatever may be thought of the effect of this case upon the right to tax the good will of a business, or the ability of the owner of property to use it to extraordinary advantage, which we find it unnecessary to approve, we consider it a strong support to the doctrine that the tangible property of a street-railway company may be assessed as a unit, and that the location of its easement and tracks as to environment, and the period that it may lawfully use it, and other exceptional privileges inseparably connected with it, may be considered in determining the value of such property; or, in other words, the assessor must not eliminate them by making reductions in the clear value of the entire plant. Unlike the good will of a merchant,

which is ephemeral, these are part and portion of the right to make any use of the property for the purpose to which, in its new form, it is adapted. Its value may be increased much or little, depending upon the opportunity for using it; just as the value of a modern sawmill may depend upon the presence or absence of accessible timber.

Mr. Justice Cooley, in his work on Taxation, intimates the same opinion as that quoted from Elliott. He says:

"The difficulties of assessing lines of railroad, which extend through many municipalities, in the same way that property in general is assessed, are so great and so obvious that in many States it is not attempted, and a franchise tax is imposed as a substitute for all other taxation. But in other States a railroad is listed, assessed, and valued as an entirety, and the value then apportioned for taxation between the several municipalities by some standard prescribed by law, which generally is the length of line within the municipalities respectively. There is no constitutional objection to that method of taxing this species of property, and it is, perhaps, more just than any other. In some States the assessing board apportions the aggregate value between the municipalities according to the estimated value of that portion of the road, with its improvements, lying within the limits of each; and in still others the roadbed, right of way, and superstructure are assessed as a whole, while the buildings and local improvements are left to be assessed locally, like the property of natural persons. * * * Where a road is thus to be assessed as a whole, bridges, tunnels, easements in and over streets, and other things and rights of a like nature, are to be taken into account, and are not subjects of separate assessment; while property not held or used for railroad purposes, but of which the corporation may have become owner, should be separately listed and taxed, unless the statute plainly makes a different provision. * * * In other States still, the local assessors are left to list and value such railroad property as is within their jurisdiction, including such portion of the roadbed and superstructure as lies within their municipality, in the same manner as they would any other property. In valuing railroad property it must be estimated by the same standards as other property is valued by." Cooley, Tax'n (2d Ed.), 383.

In *Louisville, etc., R. Co.* v. *Bate*, 12 Lea, 581, it was held that the roadbed, franchise, and superstructure of railroads are so essentially intermingled, and each so indispensable to the value of the others, that they should be assessed together. This is under a statute declaring that "the roadbed, rolling stock, franchise, etc., shall be known as distributable property," and may account for the remark in the case of *Street R. Co.* v. *Morrow*, 87 Tenn. 406 (11 S. W. 348), that "the franchise to be a corporation is property, and as such must be assessed." It is noticeable that this case, which in this respect goes further than we find it necessary to do, holds that privileges ought to be assessed with the tangible property, and adds, "Here it has been assessed along with a valuable easement,—an interest in realty." We are in accord with the conclusion, and, had the court said that the exceptional privileges, instead of the right to be a corporation, were to be considered property, and taxed, we might think it correct, even had the franchise been separately assessed under the statute of Tennessee directing the assessment of franchises as property. In *Street R. Co.* v. *Morrow* the franchise was assessed with the easement, and this was sustained, though it was said that "it would have been better to have assessed these elements of value with the iron rails, ties, spikes, etc., *as together constituting* so much street railway."

The case of *Chicago City R. Co.* v. *City of Chicago*, 90 Ill. 573 (32 Am. Rep. 54), holds that the easement in the streets, *which had been granted* (though not in fee), and by which the company *had acquired rights* in the street which *no other* person or company nor the public possessed, was taxable.

In *Rascher* v. *Railway Co.*, 90 Mich. 413 (51 N. W. 463, 30 Am. St. Rep. 447), it was said that the right of way of defendant was an easement.

In *City of Grand Haven* v. *Grand Haven Waterworks*, 119 Mich. 654 (78 N. W. 890), a tax upon waterpipe in the ground as personalty was held void, thereby

perhaps implying that it was an interest in land, and that the easement and its fixtures should be assessed together, if assessable at all.

In *Detroit Citizens' St. R. Co.* v. *City of Detroit*, 124 Mich. 449 (83 N. W. 104), it was held that a conveyance of an easement for a street railway was an interest in land. See cases there cited. It is none the less an interest in land because not a freehold interest, nor because the legislature may have expressly directed its assessment as personalty; nor should we infer from the latter fact that the track—*i. e.*, the rails, ties, etc.—must be assessed separately, and that the easement cannot be taxed at all. We think the legislature had no such intention.

In *People* v. *Com'rs of Taxes of New York*, 23 Hun, 687, it is said:

"A street-railroad company cannot be taxed for its tunnels and bridges, but it may be taxed for the easement *acquired* on the streets, and the easement is to be assessed at its fair value, as a portion of a continuous railroad. The foundation columns and superstructure of an elevated railway are included in the words 'lands and real estate,' and are taxable as such; and, in assessing such foundations and superstructure, assessors are not confined to the consideration of the land covered thereby, but may consider their position, and the business and profits to be derived therefrom. An easement of a railroad upon lands, and its tracks and other appurtenances, are land, within the meaning of the statute relating to taxation, and are to be assessed at their par value, *as a portion* of a *continuous* railroad, extending beyond the city limits."

In the case of *Pittsburgh, etc., R. Co.* v. *Backus*, 154 U. S. 421 (14 Sup. Ct. 1114), Mr. Justice Brewer quoted with approval the language used in *Franklin County* v. *Railway Co.*, 12 Lea, 521, to the effect that:

"The value of the roadway at any given time is not the original cost, nor, *a fortiori*, its ultimate cost after years of expenditure in repairs and improvements. On the other hand, its value cannot be determined by ascertaining the value of the land included in the roadway, assessed at the market price of adjacent lands, and adding the

value of the cross-ties, rails, and spikes. The value of land depends largely upon the use to which it can be put, and the character of the improvements upon it. The assessable value for taxation of a railroad track can only be determined by looking to the elements on which the financial condition of the company depends, its traffic, as evidenced by the rolling stock and gross earnings in connection with its capital stock."

Justice Brewer said further:

"Counsel sought in argument to narrow the meaning of the words 'railroad track' and 'rolling stock,' as though the two did not include the entire railroad property; but evidently the supreme court of the State construed, and, as we think, properly, the two terms as embracing all which goes to make up what is strictly railroad property. * *· * Obviously it was assumed by that court * * * that by these two descriptive terms the legislature, carrying out the declared purpose of subjecting all property within the State to taxation, not expressly exempted, meant to include all the property owned or used by the railroad companies in the operation of their roads, and which may fairly be called 'railroad property.' And, when the statute provides that such property shall be assessed at its 'true cash value,' it means to require that it shall be assessed at the value which it has as used, and by reason of its use."

In *Pullman's Palace-Car Co.* v. *Pennsylvania*, 141 U. S. 18 (11 Sup. Ct. 876), it was said, quoting from Mr. Justice Miller in *State Railroad Tax Cases*, 92 U. S. 608, 611:

"It may well be doubted whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole. * * * This court has expressly held in two cases, where the road of a corporation ran through different States, that a tax upon the income or franchise of the road was properly apportioned by taking the whole income or value of the franchise, and the length of the road within each State, as the basis of taxation. *In re Delaware R. Tax*, 18 Wall. 206; *Erie R. Co.* v. *Pennsylvania*, 21 Wall. 492."

The language of Fuller, C. J., in the case of *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194 (17 Sup. Ct. 305), is pointed in support of the propriety of assessing such property as a unit.    He said:

"No more reason is perceived for limiting the valuation of the property of express companies to horses, wagons, and furniture than that of railroad, telegraph, and sleeping-car companies to roadbed, rails and ties, poles and wires, or cars.    The unit is a unit of use and management, and the horses, wagons, safes, pouches, and furniture, the contracts for transportation facilities, the capital necessary to carry on the business, whether represented in tangible or intangible property, in Ohio, possessed a value, in combination and from use in connection with the property and capital elsewhere, which could as rightfully be recognized in the assessment for taxation in the instance of these companies as the others.    We repeat that, while the unity which exists may not be a physical unity, it is something more than a mere unity of ownership.    It is a unity of use, not simply for the convenience or pecuniary profit of the owner, but existing in the very necessities of the case, resulting from the very nature of the business. * * *    The property of an express company, distributed through different States, is as an essential condition of the business united in a single specific use.    It constitutes but a single plant, made so by the very character and necessities of the business.    It is this which enabled the companies represented here to charge and receive within the State of Ohio for the year ending May 1, 1895, $282,181, $358,519, and $275,446, respectively, on the basis, according to their respective returns, of $42,065, $28,438, and $23,430 of personal property owned in that State,—returns which confessedly do not, however, take into account contracts for transportation and accompanying facilities.    Considered as distinct subjects of taxation, a horse is, indeed, a horse; a wagon, a wagon; a safe, a safe; a pouch, a pouch. But how is it that $23,430 worth of horses, wagons, safes, and pouches produces $275,446 in a single year? or $28,438 worth, $358,519?    The answer is obvious. * * * 'Neither does the fact that the property of the express companies was valued as a unit profit-producing plant violate any federal restriction upon the taxing power of a State within which a part of that plant is found.    The value of property depends in a large degree upon the use

to which it is put.   If a railroad may be valued as a unit,
rather than as a given number of acres of land, plus so
many tons of rails, and so many thousand ties, and a cer-
tain number of depots, shops, etc., there is no sufficient
reason why the property of an express company should
not be treated as a unit plant.'   *   *   .*   We are also
unable to conclude that the classification of express com-
panies with railroad and telegraph companies as subject
to the unit rule denies the equal protection of the .laws.
That provision in the fourteenth amendment 'was not
intended to prevent a State from adjusting its system of
taxation in all proper and reasonable ways,' nor was that
amendment 'intended to compel a State to adopt an iron
rule of equal taxation.'   *   *   *   Considering, as we do,
that the unit rule may be applied to express companies
without disregarding any other federal restriction, we
think it necessarily follows that this law is not open to the
objection of denying the equal protection of the laws."

Mr. Justice Brewer, in *Adams Express Co.* v. *Ohio
State Auditor*, 166 U. S. 185 (17 Sup. Ct. 604), thus
pungently shows the justice of the assessment of the unit
inclusive of the intangible rights which swell the value of
tangible articles which enter into the property.   He said:

"Whenever separate articles of tangible property are
joined together, not simply by a unity of ownership, but in
a unity of use, there is not infrequently developed a prop-
erty, intangible though it may be, which in value exceeds
the aggregate of the value of the separate pieces of tan-
gible property.   Upon what theory of substantial right can
it be adjudged that the value of this intangible property
must be excluded from the tax lists, and the only property
placed thereon be the separate pieces of tangible property ?
*   *   *   To the owners thereof, for the purposes of in-
come and sale, the corporate property is worth hundreds
of thousands of dollars.   Does substance of right require
that it shall pay taxes only upon the thousands of dollars
of tangible property which it possesses?   Accumulated
wealth will laugh at the crudity of taxing laws which
reach only the one and ignore the other; while they who
own tangible property, not organized into a single, pro-
ducing plant, will feel the injustice of a system which
so misplaces the burden of taxation.   *   *   *   What a
mockery of substantial justice it would be for a corpora-

tion whose property is worth to its stockholders, for the purposes of income and sale, $16,800,000, to be adjudged liable for taxation upon only one-fourth of that amount. The value which property bears in the market, the amount for which its stock can be bought and sold, is the real value. Business men do not pay cash for property in moonshine or dreamland. They buy and pay for that which is of value in its power to produce income or for purposes of sale."

See, also, *Fond du Lac Water Co.* v. *City of Fond du Lac*, 82 Wis. 329 (52 N. W. 439, 16 L. R. A. 581); *Yellow River Imp. Co.* v. *County of Wood*, 81 Wis. 554 (51 N. W. 1004, 17 L. R. A. 92); *Western Union Tel. Co.* v. *Attorney General of Massachusetts*, 125 U. S. 530 (8 Sup. Ct. 961); *State* v. *Anderson*, 90 Wis. 550 (63 N. W. 746). Other cases are also cited in the briefs of counsel.[1]

The authorities are substantially uniform in support of the propriety of assessing public utilities, such as railroads, waterworks, telegraph lines, etc., as units. It is contended, however, that if a franchise—*i. e.*, an intangible license to do an exceptional business—is not made taxable property by express statute, it cannot be taxed indirectly by associating it with tangible property, thereby increasing the valuation of the latter. We think otherwise, and think it clear that property should be taxable at its cash value, whatever it may be that causes the value. If, as is claimed, this property is worth, and would bring, with the franchises that are inseparable from and necessarily go with it, somewhere from ten to fifteen million dollars, its owners have no right to expect it to be taxed on a basis of one and one-half million dollars; and we feel confident that the legislature never contemplated a construction of the tax law that should justify it. Whether the property

[1] Counsel cited, in addition to the cases cited in the opinion, *Wells, Fargo & Co.'s Express* v. *Crawford County*, 63 Ark. 576 (40 S. W. 710, 37 L. R. A. 371); *Western Union Tel. Co.* v. *Taggart*, 163 U. S. 1 (16 Sup. Ct. 1054); *Henderson Bridge Co.* v. *Kentucky*, 166 U. S. 150 (17 Sup. Ct. 532); *Adams Express Co.* v. *Kentucky*, 166 U. S. 171 (17 Sup. Ct. 527).

is worth such a sum is not for us to decide. That question is for the assessors and board of review, and, as held by the learned circuit judges, their determination cannot be disturbed, if regular and not fraudulent.

We have endeavored to show that, whatever may be the rule as to the assessment of privileges in the abstract, not connected with tangible property, the latter may be assessed for what it is worth, without reference to the cause of such value, and without analysis to see if some intangible element of value does not enter into it, which should be eliminated upon the theory that intangible things are not taxable. We have shown that this court has held that "the right to use the tracks is inseparable from the franchises, and, it not being taxable as land, it should properly be taxed as an entirety to the corporation in one place." *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 428 (43 N. W. 447). It would seem that we might treat this case as decisive upon the question of assessing as a unit both the track and the privileges of making exceptional use of the highway.

We will, however, take up the subject of our statutes, which are alleged to preclude the idea that franchises may be treated as property for the purposes of assessment. Attention has already been called to the provision that property shall be assessed at its true cash value; and we have intimated our opinion that the right to be a corporation, and the possession of the incidental and necessary functions of corporations, were not designed to be taxed, because they have no cash value under the statute, if for no other reason. We have not found it necessary to hold that a naked right to avail itself of exceptional privileges was taxable as corporate property. We do not pass upon that question. We have also referred to the statute which expressly recognizes the principle that the environment of property may affect its value. We may, at this point, mention the claim of counsel that the relator was entitled to be informed of the items of the valuation. If the property was to be assessed as a unit, there was no obligation to put separate values on the elements.

Section 3831, 1 Comp. Laws 1897, provides that, "for the purposes of taxation, personal property shall include." Then follows in 16 subdivisions the description of various kinds of property, and subd. 13 is as follows: "All other personal property not herein enumerated, and not especially exempted by law." It is contended: *First*, that franchises are not expressly mentioned, and that we should apply the doctrine of *ejusdem generis*, and consider them excluded, because the section mentions only tangible property; *second*, that provision is made by section 3842 for the taxation of corporate property in another way; and, *third*, if section 3842 shall be found invalid, it is evident that it was not the intention of the legislature to tax corporate franchises under section 3831, and therefore these franchises cannot be taxed at all.

We are satisfied that section 3842 is unconstitutional and void, because it provides for doubly taxing the property of corporations. As shown by the opinion of the circuit judges, the value of the stock less the real estate was assessable, and the cash value of all personal property, less *bona fide* indebtedness, was assessable. If there should be no real estate and no debts, the entire property of a corporation would be taxed twice, as personal estate; and, if there were real estate, all of the property would be taxed twice, part as real estate and part as personal property, if there were no debts. Again, the provision for deducting debts from personal property would be invalid because not uniform with the usual method of deducting debts, viz., from credits only. We cannot, however, sustain the claim that franchises cannot add to value because of the suggestion that the intention was to tax under section 3842, and not under section 3831. Section 3842 shows an intention to tax corporations upon all property covered by section 3831. There is no intimation that anything was to be omitted. It prescribed a method for ascertaining the amount at which a company should be assessed. That method failing, the assessor is left to the general provisions, or the property cannot be assessed at

all. No one seems to have claimed the latter effect of the invalidity of the statute. We are satisfied that the property of the relator is taxable under section 3831.

Now, as to the doctrine of *ejusdem generis*. Some kinds of property called intangible are taxable,— such as contract rights of annuity, royalty, credits of every kind. There is ground for the argument that every kind of property that has a cash value is taxable under subdivision 13 of section 3831, and that intangible property is not excluded, some of these other kinds of intangible property being included. But there are many other kinds of intangible property—such as rights of action, and of contracts executory in character—that have never been supposed to be taxable. Some of these have a purely speculative value, and some are more certainly valuable. These, like the right to exist as a corporation, are not taxable. It may be that we should say the same of naked privileges, if it were necessary to decide the question. But tangible property is taxable, and the intangible rights of use and location may increase its value for the purposes of taxation. Such seems the consensus of opinion in other States, and such seems to have been the understanding of the legislature, as appears from section 3850, if there is anything in analogy.

Having determined that there is nothing to prevent property of this character from being assessed as a unit, we should inquire whether there is any reason peculiar to this particular property to prevent it. It is urged that a practical construction has been given to the tax law, and that it has not been the custom in this State to tax property as a unit, and to permit privileges and franchises to enhance its value. We do not so understand the fact. We have supposed that manufacturing institutions, electric and gas lighting companies, and waterworks were taxed at their full cash value, and that the right to use the mains, poles, wires, etc., in the streets was included, as without these the value would be comparatively small. In further support of the claim that the

franchises should be included, see *State Board of Assessors* v. *Central R. Co.*, 48 N. J. Law, 146, 278 (4 Atl. 578); *Belleville Nail Co.* v. *People*, 98 Ill. 399; *Fall* v. *Mayor, etc., of Marysville*, 19 Cal. 391; *Central Pac. R. Co.* v. *State Board of Equalization*, 60 Cal. 35; *Fond du Lac Water Co.* v. *City of Fond du Lac*, 82 Wis. 322 (52 N. W. 439, 16 L. R. A. 581). We understand it to be conceded by at least one of the briefs for relator that "this license or easement in the streets is inseparably connected with the track, etc., of the company, and neither it nor the track can be assessed separately, but must be valued together;" citing *State* v. *Anderson*, 90 Wis. 550 (63 N. W. 746); *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 428 (43 N. W. 447); *People* v. *Mutual Gaslight Co. of Detroit*, 38 Mich. 155.

It is suggested that there are insuperable obstacles in the way of an assessment of this property as a unit, inasmuch as the street-railway system consists of several power plants, situated at different places along the line, which extends through or into several taxing districts; and, although the assessments are made by the city board of assessors for most of these, there is one that is outside of the city, with which this board has nothing to do. While it is true that a more satisfactory and just method would be to have the entire property assessed and apportioned among the districts by one board, this is not indispensable. The legislature has power to require different portions to be assessed in different places, and there is nothing to prevent a fair division of the value of the property by a mutual understanding between the several officers, if not in some other way. In the case of *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194 (17 Sup. Ct. 305), a board in the State of Ohio placed a valuation upon corporate property as a unit, although the property was not all within that State, and took an aliquot part of this as a basis for assessment. If Ohio could lawfully do that, so could Pennsylvania, and Virginia, and Kentucky; and it would seem no more difficult in the case before us than in that instance.

Another reason given for the claim that at least a portion of this property was not subject to this assessment rests upon an ordinance of the city of Detroit. It arises upon the fourth objection, already stated, viz., that the Grand River Street-Railway Company, to whose rights the relator has succeeded, is taxable, under a contract with the city, at the rate of 1 per cent. on its gross earnings, and that this is in lieu of all other taxes *for city purposes.* There is nothing in this which does away with the necessity of valuing the property, as it is necessary for the purposes of State and county taxes (*City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 425 [43 N. W. 447]); but the question is likely to arise upon an attempt being made to spread or collect the city tax, and, as it is discussed, we dispose of it here. To understand the question, we must advert to the history of the transaction. We take this mainly from the relator's brief. On August 26, 1868, a number of persons organized a corporation under an act then in the statutes known as the "Tram-Railway Act" (see 2 Comp. Laws 1897, § 6394 *et seq.*), and called it the "Grand River Street Railway." In November, 1868, the common council of the city of Detroit passed an ordinance granting to the Grand River Street Railway some privileges and rights. Section 4 provided that the railway should keep certain portions of the streets in good order and repair, and free from snow, ice, etc., and, inferentially at least, required it to pave the same. Section 22 required it to pay annually to the city treasurer, after the expiration of five years, $15 on each car used, "to be collected as a license for the use of the city." This remained in force until November 14, 1879. At the time of the organization, and when the ordinance was passed, the tram-railway act provided for the payment of a specific tax of one-half of 1 per cent. of the paid-up capital stock, to be in lieu of all other taxes. This was payable to the State. There was a similar provision in the street-railway law passed in 1867. Both were repealed in 1882. By reason of this the city could collect no tax while that pro-

vision continued in force, except the license mentioned in the ordinance, which we understand to have been paid without objection; but in 1879 a conference between the company and a committee of the council was held, and a report was made by the committee, with a proposed ordinance, which was afterwards passed.    It was as follows:

"In lieu of license fee and tax and of the existing charges for paving and street supervision, the company should pay into the city treasury a specific tax of one per cent. per annum on their gross receipts, and should pay the entire cost of materials for, as well as the cost of, excavating, grading, and paving, renewing, repairing, and cleaning the roadway spaces which constitute their track, as the council might require; reserving to the company the right to use on the surface of their roadways either cobblestone or some similar durable and proper materials."

After the repeal of the specific-tax provision of the tram-railway law, in 1882, the city undertook to impose *ad valorem* taxes upon the company in addition to the 1 per cent. provided by the ordinance, and litigation followed, which continued until a new ordinance was passed and accepted, reading as follows:

"From the 1st day of July, 1882, to the 31st day of December, 1896, said railway shall pay to the city treasurer one and one-half per cent. of its gross receipts.    From the 1st day of January, 1897, to the end of its franchise under the ordinance approved November 14, 1879, said railway shall pay to the city treasurer two per cent. of its gross receipts.    At the expiration of each half year during the entire period above mentioned, the treasurer of said railway shall submit to the city treasurer a sworn statement of such gross receipts, and shall therewith pay to the city treasurer the percentage so found to be due."

This was complied with until 1888, when, under the advice of counsel, the city attempted to levy an *ad valorem* tax, upon the claim that the ordinance of 1879 and the amendment adopted in 1887 were *ultra vires*. The same claim is made now by the respondent in answer to relator's assertion that the only tax that the city is

entitled to must rest upon the agreement contained in the ordinance in this case, as changed in 1885. In the circuit court the respondent's claim was sustained, upon the ground that the city had no power to exempt the relator from taxation, or to tax it upon a different basis than that upon which other property is taxed, and that it had no power to impose a specific tax on property which the general laws of the State subject to an *ad valorem* tax, and that it could not lawfully exempt from taxation the franchise of one street railway, and tax that of another.

The exact question before us appears to be, Was it lawful for the city to make a contract fixing the rate of city taxation which should be binding upon the city, after the repeal of the specific tax imposed by the tram-railway law, and be efficacious to relieve the street railway from paying its share of the general tax for city purposes? Counsel for the relator contend that its authority to do so is settled by the decision upon this or a similar ordinance in the case of *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 421 (43 N. W. 447), while the circuit court was of the opinion that the question is not necessarily concluded by that case, and that what was then said upon the subject of the validity of such agreements was *obiter*, because the court decided only that the city could not tax under the ordinance and also under the general law. The opinion in that case shows that the tax upon the basis of the ordinance amounted to $6,250.40, and the company had made payment on the earnings for the first half of the year, leaving a little over $3,000 due for the entire year. The tax assessed under the general law was about $1,000 less than the aggregate for the year upon the basis of percentage upon earnings. It was the opinion of the learned circuit judges that the only question decided was that the city was not entitled to both taxes, and that only that question should be considered to be concluded. Their opinion seems to rest upon the proposition that, as the Constitution forbids the creation of private corporations by any other than general laws, it also forbids the imposi-

tion of different specific taxes upon corporations similarly situated, and organized under the same general law, and that the city of Detroit could not discriminate between its street-railway lines, by taxing one and exempting another to any degree, but that the same rule must apply to all. An examination of the record in that case shows that it was an action of debt brought by the city to recover taxes claimed to be due. The first count claimed something over $6,000 under the general law. The second count was for a tax levied under the ordinance. The circuit court held that the law repealing the State specific tax was constitutional, and hence the property of tram roads was thereby turned over for taxation under the general tax law, and that the ordinance of 1879, declared upon, had been repealed by a later one passed in 1887, and hence there could be no recovery upon that count. The city took no judgment for either tax, although it might seem that it was entitled to one or the other, and upon appeal the judgment was affirmed. In disposing of the case, this court showed that section 22 of the organic act imposed a specific tax upon all corporations that might be organized under it, while by section 34 it was provided that no such company should construct a railway in any street—

"Without the consent of the municipal authorities of such town or city, and under such regulations, and upon such terms and conditions, as said authorities may from time to time prescribe: *Provided, further,* that after such consent shall have been given, and accepted by the company or corporation to which the same is granted, such authorities shall make no regulations or conditions whereby the rights or franchises so granted shall be destroyed or unreasonably impaired, or such company or corporation be deprived of the right of constructing, maintaining, and operating such railway in the street in such consent or grant named, pursuant to the terms thereof."

The opinion states further that various arrangements were made from time to time between the city and the company, and in November, 1879, a new agreement was

made, whereby it was agreed, *among other things*, that the defendant should pay a yearly tax of 1 per cent. upon its gross receipts, and do certain paving, and that "this special tax and paving liability should be in lieu of license and other taxes and paving charges." In 1882, section 22 of the organic act, providing for the specific tax, was repealed, and, disputes arising over an attempt to apply the general tax law to the defendant, a new agreement was made in 1887, whereby it was agreed that 1½ per cent. should be paid for a time, and later 2 per cent., upon gross receipts, in lieu of all taxes, license fees, and charges. If the general law was in force as to city taxes against the defendant, the agreement of 1887 was void, and nothing was in the way to prevent this court from reversing the case upon the ground that the city was entitled, under admitted facts, to a judgment for such taxes upon an *ad valorem* basis, under the general law and first count. But it did not do that. It denied relief altogether; and while it was distinctly held that the law of 1882 was constitutional, and therefore repealed the State specific tax, it was also said that, since that law was passed, the parties had compromised their rights, and agreed upon another sum that should be paid in lieu of all assessable taxes, and that this could not be recovered, because the declaration counted on the earlier and different ordinance of 1879, which was repealed by the agreement of 1887. We are unable to see how this result could be reached, if the repeal of section 22 in 1882 abrogated an existing ordinance. It seems to us that the logical and necessary inference is that the ordinance was a binding contract, still in force. To our minds, there is no difficulty in this. The legislature has, unless prohibited by constitutional restrictions, full power to pass special laws, and always had. The only limitation asserted is the provision that private corporations can be created under general laws only. But, being created under general laws, the legislature may grant privileges to them by special law in any

case that it might do the same to individuals, unless some constitutional provision, not cited, precludes it.

Again, it may impose specific taxes upon corporations. That has generally been done by the organic act, and therefore by general law. A spirit of fairness might seem to require uniformity in such tax between all corporations organized under a general law; but, the corporations being created, what is in the way of imposing specific taxes upon each according to the circumstances attending each? The legislature is authorized to impose specific taxes. It may do so or not, as it deems best. It may authorize cities to do so, and has done so in nearly every city or village charter heretofore granted. *Kitson* v. *Mayor, etc., of Ann Arbor*, 26 Mich. 325; *Youngblood* v. *Sexton*, 32 Mich. 406. The organic act under which this street railway was organized compelled it to submit to such terms in regard to local taxation as it should be able to make with the city. See *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 421 (43 N. W. 447). And every other street railway was obliged to do the same. This was a general law, but it left the city to impose or omit a special tax in each particular case as it should see fit. That may or may not have been wise. It is not a question of wisdom, but of power. When the city saw fit to make its easements and local taxes the subject of contract, the agreement bound both parties, and there is no reason for requiring the private corporation to live up to every provision of the contract, and permitting the municipal corporation to disregard it at will. Such contract was made, and is as binding as though made by the legislature itself. The railway company has paid the tax stipulated for, and been to a large expense in paving, etc., under the contract. The abolition of a special tax and the passage of a general tax law have not changed the contract. At least, this was the view we understand to have been taken in the case of *City of Detroit* v. *Detroit City R. Co.*, which we think is conclusive of the question. Cooley, Tax'n (2d Ed.), 66. That, in the ab-

sence of constitutional prohibition, the legislature has unlimited power, does not admit of doubt.   See *Atlantic, etc., R. Co.* v. *Lesueur,* (Ariz.) 19 Pac. 157, 1 L. R. A. 244.   The respondent must be content to measure its city taxes by the terms of its contract.

It is contended that this immunity from taxation was not assignable with the property of the Grand River Railway Company; but we think this position untenable.   The statute permits an assignment, and all rights resting in contract are included.   Section 15 of the street-railway law provides:

"Any street-railway company may also purchase and acquire, either at public or private sale, whether judicial or otherwise, or may hire, any street railway in any city, village, or township, owned by any other corporation or company, together with all the real and personal estate belonging thereto, and the rights, privileges, and franchises thereof, and may use, maintain, and complete such road, and may use and enjoy the rights, privileges, and franchises of such company, the same, and upon the same terms, as the company whose road and franchises were so acquired might have done.   Every street-railway company may also purchase, hold, own, or take upon lease such real estate, barns, stables, buildings, fixtures, and property as may be necessary for the use and business of their road; and the whole or any part thereof, together with their railway, fixtures, property, and appurtenances, rights, privileges, and franchises, may sell, lease, dispose of, pledge, or mortgage, whenever the corporation shall deem it expedient so to do."   2 Comp. Laws 1897, § 6448.

We now approach a question of fact, viz., Was the intangible personal property (*i. e.*, the franchise) assessed with the tangible property, and, if so, did such assessment include the first two classes of franchises?   An issue was framed upon this subject, and the finding shows that the franchise to construct, maintain, and operate the railway, and to collect fares, was taken into consideration in valuing relator's personal property.   There is testimony which supports this finding; for, while Hally testifies that, in considering the subject, an estimate was placed on several

items of property, and also upon the franchises, the board
finally adopted an aggregate sum which should include
all.   He was asked:

"Mr. Hutchins stated, if I recollect his testimony
correctly, that, in his talks with you, you refused to
separate or give them the franchise valuations and valua-
tions of the different pieces of property and kinds at the
times they were there.    What was said about that?

"*A.* Why, I did refuse.   My testimony is simply that I
had placed—that we had placed—the assessment against
each one of the companies as a unit, and had taken into
consideration the trackage and overhead system and roll-
ing stock and machinery and power-house plant and the
franchise, in making the assessment, and that the sum
total represented the value that we had placed upon the
whole of it."

This finding of fact is final.   The case, being here by
*certiorari,* is not to be tried *de novo ;* nor can the find-
ing be set aside unless it clearly appears to be unsupported
by the evidence.   *Dove* v. *Independent School Dist.,* 41
Iowa, 689; *Odendahl* v. *Russell,* 86 Iowa, 669 (53 N. W.
336); *Independent Dist. No. 2* v. *Rhodes,* 88 Iowa, 570
(55 N. W. 524); *People* v. *Town of Waynesville,* 88 Ill.
469; *People* v. *Albright,* 14 Abb. Prac. 305.

Much stress is laid upon the fact that the assessment
closely approximates the aggregate of certain items (one
of which was franchises, $2,000,000) which were made
and reported by a commission appointed, as we understand
it, by the council, to ascertain the value of the property
with a view to its purchase by some one, which figures
and report were before the assessors and considered by
them.   It is insisted that we must find that this was the
actual assessment, although these items were combined in
the roll finally.   If the question were not concluded by the
finding, and if we could say that the aggregate contained
an assessment placed on the naked franchise, disassociated
from the tangible personal property, and irrespective of
the cash value of the whole, we might be justified in treat-
ing it as an improper assessment, and, although made in

good faith, a legal fraud.   But we are not to hastily treat mental processes as assessments, and, ·if the assessors could be said to have estimated the franchise separately, taking into account its duration and its profitableness, to ascertain the value of the plant, it does not necessarily invalidate the assessment.   Perhaps no two of the assessors reached the result by the same process, but that is not material, if they finally concluded that the property was honestly worth in the market, in cash, the sum assessed.

Complaint is made that the assessors refused to specify to relator separate values upon the franchise and the tangible property, or to tell how they reached the conclusion arrived at by them.   There seems to have been no misunderstanding between the parties as to what property was being assessed.   Both knew it was the street-railway plant, and relator knew that the board claimed that the privileges should increase the value of the tangible property.   It had hearings before the board and a committee of the council acting under orders from the council in the matter of review.   It was told that the board had been advised that the franchise could not be separately assessed. It is significant that there is no evidence called to our attention that this tangible property, in connection with the privileges that belong to it, and which would be sold with it, is worth less than the amount at which it was assessed.   No offer was made to produce such proof before either board, and we have no reason for saying that the property was overvalued, unless we should sustain relator's contention that intangible values should be eliminated altogether.   We think this assessment should not be set aside merely because an effort may have been made by some one to separate tangible and intangible values,—a thing that was unnecessary, and one that was harmless, provided, as already stated, the board really did reach the conclusion that the property was worth and would bring in cash the sum adopted.

There is another branch of this case which we must yet

consider, viz., whether the proceeding was void for irregularity. The claim is made that there are several fatal defects in the proceedings. They are as follows:

"The assessment roll was not completed by the board of assessors on the first Tuesday of April.

"No assessment had been made against the street-railway companies on or before the third Tuesday of April.

"No opportunity was given them on or before the third Tuesday of April to see or learn what their respective assessments were.

"No legal hearing was given them by the board of assessors, sitting as a board of review.

"No hearing on its appeal was given relator by the common council, sitting as a board of review.

"The hearing given relator by the common council was not a hearing of its appeal by the common council as prescribed by statute.

"The circuit court could not lawfully refuse to pass upon the grounds set up in the so-called supplemental appeal of relator from the action of the board of assessors.

"The assessment is void because fraudulently and knowingly excessive, and because the judgment of the assessors was never brought to bear upon the value of the relator's property, and because the assessors failed and refused to separate the tangible from the intangible personal property of relator."

The common council of Detroit is the board of review, and an appeal was taken from the assessment made by the board of assessors, on April 18th, upon grounds stated in relator's protest filed with the board of assessors. In conformity to its usual practice, the council referred the matter to its committee to investigate and report. Relator appeared before the committee and was heard on several occasions, without objection, and afterwards the committee made a report to the council upon the relator's assessment, which was adopted. On the 8th day of May the relator addressed to the council a claim of further appeal, for several additional reasons and grounds. If these points were called to the attention of the board of assessors, the proof has escaped our observation. They were not included in the original protest. It is stated that

they were not filed with the council until after the hearings before the committee were concluded, and on the same evening that the committee's report was adopted. The circuit court held that this supplemental appeal should not be considered. The city charter (section 168) provides for the appeal, and contains the following:

"Every appeal shall be in writing, and shall state specially the grounds of the appeal and the matter complained of, and no other matter shall be considered."

It appears that the relator ascertained the amount of its assessment, and contested it repeatedly before the board of assessors and the committee of the board of review. It raised none of these alleged jurisdictional questions now said to be fatal, but rested and relied upon the four points contained in its protest. After all of these hearings, if not after the report of the committee, it filed a paper claiming another appeal upon the ground of alleged technical irregularities. These were not considered, and we agree with the circuit court that they were not entitled to consideration. Relator had raised the meritorious questions, and its rights were in a situation to be secured upon review if the council dealt unjustly with it; but it had waived the technical ones. Assessment and collection of taxes is a matter of so much detail that absolute accuracy is impossible, and the statute (1 Comp. Laws 1897, § 3922) attempts to protect the public against irregularities that do not prejudice, and the courts recognize the validity of this legislation. "The party alleging error must show error to his prejudice." *Louden* v. *City of East Saginaw*, 41 Mich. 18 (2 N. W. 182). "Irregularities in assessment, when not prejudicial to protestant, give no right to recovery." *White* v. *Township of Millbrook*, 60 Mich. 532 (27 N. W. 674). See, also, *Stockle* v. *Silsbee*, 41 Mich. 615 (2 N. W. 900); *Wright* v. *Dunham*, 13 Mich. 414; *Bird* v. *Perkins*, 33 Mich. 28; *Wilt* v. *Cutler*, 38 Mich. 189; *Auditor General* v. *Sparrow*, 116 Mich. 574 (74 N. W. 881); *Auditor General* v. *Keweenaw Ass'n*, 107 Mich. 405 (65 N. W. 288).

Counsel contend that their rights have been violated in this:

"1. That, after the assessment against the relator was made, it was denied the right of review before the board of assessors.

"2. That the relator was denied an opportunity to be heard by the common council upon the appeals taken by it to that body."

They insist that the method adopted, of not filling out the roll until after the amounts of assessments were fixed by the board of review, was not a compliance with the law, and consequently they were denied the right of review before the board of assessors. We think the method adopted was not a compliance with the law, and there is no reason why the board should not have a completed roll at the time prescribed. See *Common Council of Village of Three Rivers* v. *Smith*, 99 Mich. 510 (58 N. W. 481). But we think this is not fatal in this case. The relator understood the situation, and had an opportunity to be heard as effectively as though the roll had been finished and present. Had these questions been raised seasonably, there might be more merit in this contention. It is as though the relator had not appeared before the board of review. See *Township of Caledonia* v. *Rose*, 94 Mich. 216 (53 N. W. 927). We think the roll was in existence, to all intents and purposes, so far as the questions raised before the board of assessors are concerned. *Auditor General* v. *Ayer*, 122 Mich. 136 (80 N. W. 997).

Whether a second appeal was allowable or not, the council was justified in treating it as abandoned. It is possible that the relator had a right to be heard before the council upon the subject of its first appeal, for it cannot delegate the power of final determination; but it was not required to notify the relator when to attend. This report was filed May 8th. Presumably, it embodied all contests that had arisen. Several persons who had appealed were heard by the council that night. The relator contented itself with sending a paper to be filed, expressing a desire to be heard

upon the matter, and also upon a further appeal. If it desired to be heard, it should have been present and asked to be heard. Relator has not been denied due process of law. It has had its opportunity to be heard upon every meritorious question that it has raised. *Attorney General* v. *Jochim*, 99 Mich. 371 (58 N. W. 611, 23 L. R. A. 699, 41 Am. St. Rep. 606); *Rouse, Hazard & Co.* v. *Wayne Circuit Judge*, 104 Mich. 234 (62 N. W. 359, 27 L. R. A. 577, 53 Am. St. Rep. 457).

As foreshadowed by what has been said, the order of the circuit court denying the writ of *mandamus* must be affirmed.

The other Justices concurred.

### ON APPLICATION FOR REHEARING.

HOOKER, J. This cause is before us on respondent's application for a rehearing.

At the time the city authorized the building of these railroads, the policy of the State was to collect a specific tax in lieu of other taxes. At the same time the legislature so far modified this rule that it permitted the city to contract for the payment of local taxes as a condition to the building of the roads. *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 425 (43 N. W. 447). When made, that was a binding contract on the city for the period for which the company was authorized to use the streets. Neither party could change it without consent of the other. In 1882 the policy of the State was changed, and the provisions relating to the specific tax were repealed, and thenceforth State and county taxes were levied in accordance with the rule pertaining to other property. But this could not affect existing contracts, and the railways theretofore organized had the right to pay local taxes on the basis of such contracts. The city of Detroit made the repeal of the law providing for the specific tax a ground for claiming the right to ignore the contract in

relation to city taxes, and dissensions arose, which led to a new arrangement. Thus, in 1887 the Detroit City Railway consented to an adjustment of this controversy by accepting a new ordinance; and this was passed upon in the case of *City of Detroit* v. *Detroit City. R. Co.*, 76 Mich. 421 (43 N. W. 447). In 1885 the same thing had been done in the case of the Grand River Street Railway, and the tax has since been paid upon the basis of that arrangement. Now the city is again insisting upon a right to ignore its contract and increase the tax upon this property.

We passed upon the question in our original opinion, but counsel ask a rehearing upon the ground that we overlooked the fact that the ordinance of 1887 relating to the Detroit City Railway and that of 1885 relating to the Grand River Railway are not identical in terms. Both had contract rights that were invulnerable under their original franchises. Both undertook to adjust controverted rights by accepting new ordinances, making new contracts, which this court in the case cited has held might be done. The second of these readjustments contained the provision:

"The above-mentioned percentage payments and the tax on lands provided for to accrue from January 1, 1887, to the end of the franchise of said railway, shall be paid by the said railway and received by the city in lieu of and in discharge of all taxes, license fees, and charges of any kind against the property, capital stock, rights, and franchises of. said company which have been or may be levied, assessed, or imposed under any present or future law or authority."

That relating to the Grand River Railway was less specific. It provided for an increased tax on gross receipts. It took the place of a former contract. It contained the provision that:

"Said special tax shall be in lieu of license and other taxes and charges under existing ordinances: *Provided,* that this shall not in any manner affect the obligations of said company in the matter of paving or repairing pavements as required by existing ordinances."

Had the words "under existing ordinances" been omitted, there would probably be no claim that the case would not be within the decision of *City of Detroit* v. *Detroit City R. Co.*, 76 Mich. 425 (43 N. W. 447). The only city taxes collectible were those provided for by existing ordinances. No others could be imposed, except by consent of the railway company. They did consent, but it was upon the condition that the new tax agreed upon should be *in lieu* (*i. e.*, should *stand in the place*) of the pre-existing tax. This *did not mean in part, but was a full substitute for the previous contract obligation.*

The city of Detroit had granted contract rights which it disputed, and a compromise was made, and new contract rights were created. The effect of counsel's contention is that, notwithstanding this new arrangement, and the controversies that the parties sought to settle by it, the new contract really settled nothing, and left the council the right to increase the tax at will, by a new ordinance, which might take effect as soon as the same could be adopted. The question was not overlooked. We adhere to the opinion already expressed,—that the city must accept taxes under this contract.

The motion for rehearing is denied.

The other Justices concurred.