[No. 24132. *En Banc.* May 17, 1933.]

BANK OF FAIRFIELD et al., *Respondents*, v. SPOKANE COUNTY, *Appellant.*[1]

[1]Reported in 22 P. (2d) 646.

146

*C. W. Greenough, A. O. Colburn,* and *Harry A. Rhodes,* for appellant.

*William Hatch Davis, E. D. Weller, Roy E. Lowe,* and *B. H. Kizer,* for respondents Bank of Fairfield *et al.*

*Graves, Kizer & Graves,* for respondents H. J. Shinn & Company *et al.*

*Post, Russell, Davis & Paine* and *Alex M. Winston,* for respondents National Savings and Loan Association *et al.*

*Parker W. Kimball, Danson, Lowe & Danson,* and *McCarthy & Edge,* for respondents Northwestern & Pacific Hypotheekbank *et al.*

*Fred J. Cunningham,* for respondents Lincoln Trust Company *et al.*

STEINERT, J.—This case comprises fifty-eight separate actions, consolidated for purposes of trial and appeal. In each of the actions, the respective plaintiffs seek to invalidate certain taxes for the year 1928 levied

under assessments, or rather reassessments, made on omitted property and on bank stocks in 1931, the original 1928 assessments having theretofore been cancelled. Upon a trial before the court, sitting without a jury, the assessments, or reassessments, and the taxes extended and levied thereon, were ordered cancelled and set aside, and the defendant perpetually enjoined from any further attempt to collect them. From the various decrees rendered in the respective cases, the defendant has appealed.

The procedure adopted by the county and its taxing officers in their attempt to make these assessments, or reassessments, and to levy the taxes thereon, has its background and preparatory basis in certain decisions formerly rendered by this court, namely, *Spokane & Eastern Trust Co. v. Spokane County,* 153 Wash. 332, 280 Pac. 3; *National Bank of Commerce of Seattle v. King County,* 153 Wash. 351, 280 Pac. 16; *Yakima National Bank v. Yakima County,* 153 Wash. 375, 280 Pac. 25, all decided August 9, 1929; to which some impetus was later added by the decision in the case of *Aberdeen Savings & Loan Ass'n v. Chase,* 157 Wash. 351, 289 Pac. 536, 290 Pac. 697, 71 A. L. R. 232, rendered June 12, 1930. All of these decisions were *En Banc.* In order to get a proper perspective of the present actions, we will briefly review those former decisions.

In the *Spokane & Eastern Trust Co.* case, it was held that, in determining the value of bank stock for taxation purposes, the value of the banks' non-taxable securities could not be taken into consideration, because, otherwise, the effect would be to impose a tax indirectly on property which the legislature had specifically said should be exempt, under chapter 130, Laws of 1925, Ex. Ses., p. 228, § 5, Rem. Rev. Stat., § 11109, which provides that mortgages, notes, accounts, certificates of deposit, tax certificates, judg-

ments, state, county, municipal and taxing district bonds and warrants shall not be considered as property for the purpose of the taxation act.

In the *National Bank of Commerce* case, it appeared from the evidence that national banks were being taxed upon their shares of stock, the value of which, as determined by the assessor, included their capital, surplus and undivided profits, whereas, in the case of certain of their competitors, such as savings and loan associations, mutual savings banks, trust companies, domestic and foreign finance corporations, industrial loan companies, bond dealers, investment bankers, note brokers, mortgage loan companies, and domestic insurance companies, no assessments were made upon any of their personal property or intangible assets other than office furniture and fixtures. It was held in that case that "moneyed capital" employed in such a manner as to bring it into substantial competition with the business of national banks, as was done in the instances referred to, was within the restriction of U. S. Rev. Stat., § 5219 (U. S. C., title 12, § 548), which prohibits state taxation of shares of national bank stock at a greater rate than is assessed upon other "moneyed capital" in the hands of individual citizens of such state coming into competition with the business of national banks. It was further held that the competitive nature of "moneyed capital" did not depend upon an absolute competition in all phases of business conducted by national banks, but was established when it was shown that such capital was employed, either by an individual or by a corporation, in the same sort of transactions as that in which national banks were engaged in any of their capacities; the determining factor being, not the character of the competitive business, but the manner of employment of capital by the competitor.

The *Yakima National Bank* case was a companion to the *National Bank of Commerce* case, and expressed the same conclusion and result. Judge Holcomb concurred in the *National Bank of Commerce* case and dissented in the *Yakima National Bank* case, on the ground that, in the former case, the competing capital was employed in the same locality and was substantial in amount when compared with the capitalization of the national banks, while in the latter case, he said, those elements were lacking.

In the *Aberdeen Savings & Loan Ass'n* case, it was held that a tax on banks and financial corporations, measured by their net income, as provided in chapter 151, Laws of 1929, p. 380 *et seq.*, was unconstitutional and void, in that it violated the "equal protection clause" of the Federal constitution, and was in contravention of the laws of the United States which provide that no state shall have authority to tax the income from tax-exempt government securities. Although there were two dissenting opinions in that case, the court, by *per curiam* opinion on petition for rehearing, adhered to its original holding. The same result was reached in *Burr, Conrad & Broom v. Chase,* 157 Wash. 393, 289 Pac. 551.

Thus it will be seen that the sum total and effect of those decisions is (1) that credits of the nature above referred to can not be taken into consideration in fixing the value of bank stock; (2) that shares of stock of a national bank can not be taxed at a greater rate than is taxed against other "moneyed capital" employed in substantial competition with that of national banks; and (3) that a tax upon banks and financial institutions measured by their net income is offensive to the Federal constitution and therefore invalid.

At the time that the decisions in the original bank cases were rendered, namely, August 9, 1929, there

were pending in Spokane county a number of cases involving the same questions as were involved in the adjudicated cases. Recognizing the controlling effect of those decisions, the prosecuting attorney of Spokane county consented to the entry of decrees in the pending cases, cancelling the bank taxes therein sought to be collected.

Despite the situation as it then stood, the prosecuting attorneys throughout the state, generally, felt convinced that a vast amount of taxable property of various banks and other financial institutions and associations in the state had been omitted from the tax rolls, or had not been properly assessed. They further felt that their conviction was confirmed by certain expressions of this court, particularly in the dissenting opinions in the very cases, *supra,* which had held that the taxes sought to be collected could not be levied in the manner followed by the taxing officers. The prosecuting attorneys also conceived it to be their duty, as legal advisers of the taxing authorities in their respective counties, to ascertain, if possible, the proper method of subjecting such property to assessment and taxation, for the guidance of those to whom was immediately committed that responsibility.

As such advisers, they focused their attention upon a consideration of the questions thus significantly presented and suggested by the recent decisions. The initiative in this respect was taken by Mr. A. O. Colburn, deputy prosecuting attorney for Spokane county, aided by Mr. Harry W. Rhodes and Mr. D. D. Schneider, who held similar positions in King and Pierce counties, respectively. After a careful analysis of the immediate decisions and an extensive study of tax cases generally in this state, Mr. Colburn, with commendable zeal, prepared and submitted a tentative

brief for the consideration and guidance of the assessors of the state.

As deduced from the foregoing decisions, the problem, as it appeared to Mr. Colburn, required the valuation of bank stock for tax purposes upon some basis that would be upheld by the courts, and the placing upon the tax rolls, as omitted property, the capital stock, or equivalent taxable property, of all or substantially all other and competing financial companies as catalogued in the *National Bank of Commerce* case. In determining the value of capital stock, it was recognized that charges of inequality might be raised if certain stocks, for which there was a market value, were assessed upon that basis, and other stocks, for which there was no ready and available market, were assessed upon some other basis. He therefore concluded that the only fair, equitable and workable method of measuring the value of capital stock was by first ascertaining *all* the taxable and non-exempt personal assets of the particular institution, leaving out of consideration its real estate, and then appraising the value of the ascertained items in the same way as items of similar personal property were customarily appraised. He next concluded that the taxable items of personal property would consist of the office furniture, fixtures, safe deposit vaults, supplies, automobiles and similar tangible items, together with the actual coin or currency on hand, and also the *franchise* or right of the institution to do business.

Methods for the valuation of franchises were then suggested. These included the consideration of anticipated profits, the length of time that the corporation had been in existence, the character of its business, the location in which the business was being conducted, its gross receipts and, principally, the results of capitalizing the net earnings. The net result of the plan as

thus formulated was that, as to bank stock, its value was to be ascertained upon the basis of what it would be taken at, from a solvent debtor in payment of a just debt, and from such value was to be deducted the value of the corporate realty, but with no other deductions.

As to other and competing corporations, the assessment was to be levied against their tangible personal assets, such as office furniture and fixtures, and also their franchise to do business, leaving out of consideration those intangible assets which may be generally designated as credits, consisting of mortgages, notes, accounts, etc., which, under chapter 130, Laws of 1925, Ex. Ses., p. 228, § 5, Rem. Rev. Stat., § 11109, were not to be considered as property.

. The plan as thus formulated was suggested to the various assessors and, so far as these cases are concerned, it is contended by the appellant, was substantially followed by the assessor of Spokane county.

The institutions involved in these actions are of four general classes: (1) state banks; (2) trust companies; (3) savings and loan associations; and (4) financial corporations variously engaged in dealing in stocks, bonds, mortgages, commercial paper and general securities.

To get a comprehensive picture of the situation presented by the facts in these cases, we may select an instance from each of the four enumerated classes as being fairly typical and illustrative of the question as a whole. While the specific instances may not be a complete index to all the details relative to the cases in any one class, they are sufficiently typical to suggest the nature of the problem.

A typical bank is that of Bank of Fairfield. Its statement of assets and liabilities. shows the following:

#### Assets:

| | |
|---|---:|
| Loans and discounts | $223,415.71 |
| Overdrafts | 243.74 |
| Real estate | 700.00 |
| U. S. and other bonds | 85,353.26 |
| Cash and exchange | 108,215.71 |
| Other assets | 6,900.00 |
| Total | $424,828.42 |

#### Liabilities:

| | |
|---|---:|
| Capital stock | $25,000.00 |
| Surplus and undivided profits | 13,654.76 |
| Deposits | 386,173.66 |
| Total | $424,828.42 |

The bank was capitalized at twenty-five thousand dollars, divided into two hundred and fifty shares of the par value of one hundred dollars each. The actual fair, cash value per share on March 1, 1928, was one hundred forty-eight dollars. Its average rate of dividend was eight per cent, although, in 1927, it was as high as twenty per cent. Its total stock was assessed for the year 1928 upon an equalized value of $18,200, being fifty per cent of its full value as fixed by the assessor, and a tax of $1,157.52 was levied thereon. On the basis of the value of its furniture and fixtures, the bank actually paid a tax of $114 for that year.

A typical trust company is the Lincoln Trust Company. Its statement of assets and liabilities is as follows:

#### Assets:

| | |
|---|---:|
| Cash on hand and in banks | $15,754.32 |
| Bonds | 101,726.25 |
| Bills receivable | 27,903.27 |
| Loans on own bonds | 21,427.61 |
| Real estate mortgages | 213,204.48 |

| | |
|---|---:|
| Real estate contracts............. | 23,154.00 |
| Other real estate............... | 26,754.86 |
| Other assets .................... | 2,447.58 |
| Total ...................... | $432,372.37 |

LIABILITIES:

| | |
|---|---:|
| Capital stock ................... | $100,000.00 |
| Undivided profits ............... | 3,294.04 |
| Bonds outstanding .............. | 327,323.61 |
| Accounts payable .............. | 1,754.72 |
| Total ...................... | $432,372.37 |

The company was capitalized at one hundred thousand dollars, divided into one thousand shares of the par value of one hundred dollars each. Its gross income for the year 1928 was $28,786.20. Its net income for the same year was $5,351.57. Its franchise was assessed at $22,000, and the tax levied thereon was $1,320. What tax it actually paid, and on what basis, is not revealed by the record. Presumably, it was on the basis of its office furniture and fixtures and would be only a small amount in comparison with the amount of the tax levied by the county.

A typical case of savings and loan associations is the National Savings & Loan Association. Its statement of assets and liabilities is as follows:

ASSETS:

| | |
|---|---:|
| Cash ......................... | $6,935.00 |
| Deposits in other banks........ | 122,690.00 |
| Mortgage loans................ | 2,201,153.21 |
| Stock loans ................... | 300.00 |
| Furniture and fixtures......... | 22,452.54 |
| Prep. insurance ............... | 547.92 |
| Insurance reserve ............. | 2,024.10 |
| Suspense account.............. | 9.45 |
| Total ................... | $2,356,112.22 |

LIABILITIES:

| | |
|---|---|
| Savings | $2,265,155.95 |
| Incomplete loans | 3,426.34 |
| Contingent fund | 28,145.87 |
| Undivided profits | 37,787.81 |
| Surplus | 21,596.25 |
| Total | $2,356,112.22 |

It has an authorized capital of five million dollars, divided into shares, each of which when fully paid is of the value of one hundred dollars. It had at the time 9,760 deposit accounts, and, in 1928, paid a dividend of five per cent to its depositors. In addition to its small and average loans, it made large loans ranging from sixteen thousand to two hundred thousand dollars, to single borrowers who had made only small deposits in order to qualify them for obtaining such loans. Its franchise was assessed upon a valuation of $88,000, and a tax levied in the sum of $5,280. The tax actually paid was upon its personal property, valued at $1,375, the tax amounting to $82.50. It also paid the state a license fee for 1928 in the sum of $816.

The fourth class above referred to comprises various kinds of financial corporations. Space will not permit us to give an instance of each particular kind. We select only one as being more or less typical of all. Ferris & Hardgrove was incorporated in 1926. Prior to that time, it had been a partnership operating under the same name. Under its articles of incorporation, it was authorized to conduct a general investment business. Its business, in 1928, was that of buying and selling bonds and preferred stock. On April 1, 1928, it had a working capital of $260,500, divided into $10,000 of common stock, $100,500 of first preferred stock, and $150,000 of second preferred stock. Its total assets amounted to $885,108.56, and its surplus amounted to

$20,045.43. The net earnings for the previous year totaled $65,624.68. In 1931, the assessor made an assessment of its franchise, as of the year 1928, upon a valuation of $44,000 and levied a tax thereon amounting to $2,640. Its office furniture, etc., were valued at $2,400, and it actually paid a tax of $72 for that year.

With this detail of facts and figures before us, showing the wide discrepancy between the taxes actually paid by these various institutions upon the basis of the returns made by them and the amounts which the assessor conceived them justly obligated to pay, the purpose and effect of the plan and procedure adopted and followed by the taxing officials become better understandable. Under the decrees entered by the court upon the trial, however, the effort of the authorities became wholly abortive and fruitless. The purpose of this appeal is to obtain a judicial sanction of the procedure followed by the assessor, and a ruling which will enable the authorities to make their efforts financially effective in the interest of the county and state. We have voluminous briefs from many able counsel representing appellant and the various respondents.

The appellant predicates its appeal upon six assignments of error.

██ Its first assignment is that, under the provisions of chapter 62, Laws of 1931, p. 201, Rem. Rev. Stat., §§ 11315-1 to 11315-8, the court was without jurisdiction to grant injunctions against the collection of the taxes. Section 1 of that act provides that injunctions and restraining orders shall not be issued or granted to restrain the collection of any tax or part thereof, except where the law under which the tax is imposed is void, or where the property taxed is exempt. That act, having an emergency clause, became effective March 18, 1931, at which time these actions had already been commenced and were pending. There was no

clause in the act relieving these cases from its operation. The appellant therefore contends that the act applies to pending cases as well as to those brought after its enactment, and that the court should therefore have dismissed the actions for lack of jurisdiction.

Objection on this score was not raised by the appellant during the course of the trial, but is raised for the first time by its brief filed in this court. Had the objection been timely raised, the respondents might have elected either to proceed with their actions or else to dismiss them, and, after payment under protest, sue to recover the amounts so paid, as provided in § 2 of the act; or they might, upon compulsion by the court to dismiss, have resorted to the substituted form of procedure. Under § 6 of the act, any action to recover taxes paid under protest would now be barred, and respondents would, therefore, under appellant's contention, be without any relief.

Prior to the passage of the act, the respondents were entitled to injunctions upon a sufficient showing therefor. They availed themselves of that remedy. The primary relief sought by the respondents, however, was an adjudication of the illegality of the assessments and taxes; the preliminary restraining orders were merely incidental to the primary relief. The court was, and continued to be, vested with jurisdiction to determine the validity of the assessments, and, of course, the statute did not, and could not, deprive the court of such jurisdiction. Exercising its jurisdiction, the court declared the assessments void. The judgments do not derive their efficacy from the preliminary restraining orders nor from the permanent injunctions, and if the injunctive features be entirely eliminated from the judgments, the latter stand unimpaired, nevertheless, as adjudications that the assessments and taxes are illegal and void.

The question, therefore, presented to the lower court, or as it might have been presented to it, was not a question of the jurisdiction of the court with reference to the real subject matter of the action, but involved simply one phase of the remedy sought. The matter of the injunctive feature is now a moot question.

Appellant cites and relies upon *Bailey v. School District No. 49,* 108 Wash. 612, 185 Pac. 810. That case is not in point. The statute there relied on provided that no action shall be brought or *maintained* against school districts for certain torts. The legislature plainly intended to, and did, abolish the right of action entirely. The statute with which we are here concerned not only did not abolish the right to question the validity of a tax, but distinctly preserved it.

The appellant next contends that the court erred in holding that the corporate franchises of the respective respondents were not taxable. This question presents many different phases and angles, and is beset with many intricacies and difficulties. To pursue the matter to the extent of discussing and concluding every question raised or suggested by the briefs, would involve a task which neither time nor space would permit, and, in the light of all that has been judicially or textually said or written upon the subject, might still leave one in considerable doubt.

The question, briefly stated, is whether the right of a corporation to exist and do business in corporate form is property subject to an *ad valorem* tax under the law of this state.

Franchises, which is the term applied to the subject under discussion, are of three kinds: (1) the franchise ''to be,'' often designated as the corporate or creative franchise, which is the grant of corporate life from the state or United States; (2) the franchise ''to do,'' which is the privilege granted to a corporation, when

organized, to perform certain acts and carry on certain business; it is the corporation's power of activity, and naturally and impliedly goes with its right of existence; and (3) special franchises, which are privileges accorded to certain corporations not enjoyed by others in general; these are generally denominated as public utility franchises. Since the first two classes are so inseparably connected with each other, they are usually referred to as "primary franchises," and the third class as "secondary franchises." In this case, we are concerned only with the so-called primary franchises, so that the immediate question before us is whether the corporation's primary franchise, its right to exist and do business, is subject to an *ad valorem,* or property, tax.

Whether franchises are, or are not, subject to an *ad valorem* tax, must depend upon whether they are considered as taxable property under the constitution and statutes of this state. Generally speaking, the word "property" includes all property of whatsoever description, whether tangible or intangible. 2 Cooley on Taxation (4th ed.), § 551. Art. VII, § 2, of our state constitution, as it stood at the time when these assessments were made and taxes levied thereon, provides that the legislature shall prescribe by law a uniform and equal rate of assessment and taxation on *all* property in the state, according to its *value in money,* and shall also prescribe such regulation, by general law, as will secure a just valuation for taxation of *all* property, so that every person and corporation shall pay a tax in proportion to the *value* of his, her or its property.

"The constitution provides, in the first place, that all property not exempt under the laws of the United States or under this constitution shall be taxed in proportion to its value. This is a mandatory declaration

of the constitution that all property, with the exceptions mentioned, shall be taxed. Sec. 2 then further provides that the legislature shall provide a uniform and equal rate of assessment and taxation on all property in the state. Here is another announcement or declaration that all property in the state shall be taxed, and, if there are any exemptions, they must be especially and clearly indicated. The constitution makers seem to have exhausted the English language almost in attempting to secure a just and equal valuation for taxation of all property, for they explain the reason of the rule announced in the first part of § 2 as follows: 'So that every person and corporation shall pay a tax in proportion to the value of his, her or its property.' " *State ex rel. Chamberlain v. Daniel,* 17 Wash. 111, 119, 49 Pac. 243.

Pursuant to the constitutional mandate, the legislature, by enacting chapter 130, Laws of 1925, Ex. Ses., p. 227, Rem. Rev. Stat., §§ 11105-11298, which is virtually a tax code, provided for the taxation of all property. Section 5 of the act, Rem. Rev. Stat., § 11109, defines the term "personal property" as including and embracing, without especially defining and enumerating it,

" . . . all goods, chattels, stocks, . . . ; and all property of whatsoever kind, name, nature and description, which the law may define or the courts interpret, declare and hold to be personal property for the purpose of taxation . . . "

The general clause following the enumerated statement does not say "all *other* property," thus bringing it within the rule of *ejusdem generis,* but, rather, evinces the intent and purpose to include all property that the courts may declare and hold to be personal property.

Now, whether the franchise "to be" is a form, or species, of property, is a question that has been variously decided. The following cases hold that it is:

*Horn Silver Mining Co. v. New York*, 143 U. S. 305, 36 L. Ed. 164; *Postal Telegraph Cable Co. v. Adams*, 155 U. S. 688, 39 L. Ed. 311; *Schwab v. Richardson*, 263 U. S. 88, 68 L. Ed. 183; *Bank of California v. San Francisco*, 142 Cal. 276, 75 Pac. 832, 100 Am. St. 130, 64 L. R. A. 918; *Spring Valley Water Works v. Schottler*, 62 Cal. 69 (affirmed in 110 U. S. 347, 28 L. Ed. 173); *Porter v. Rockford, R. I. & St. L. R. R. Co.*, 76 Ill. 561. See, also, *Flint v. Stone-Tracy Co.*, 220 U. S. 107, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. The following cases hold, for various reasons, that it is not: *Commonwealth v. Ledman*, 127 Ky. 603, 106 S. W. 247; *State ex rel. Kansas City v. East Fifth Street Ry. Co.*, 140 Mo. 539, 41 S. W. 955, 62 Am. St. 742, 38 L. R. A. 218; *Faure Electric Light Co.'s Case*, 43 N. J. Eq. 411, 5 Atl. 817; *Blackrock Mining & Milling Co. v. Tingey*, 34 Utah 369, 98 Pac. 180, 131 Am. St. 850, 28 L. R. A. (N. S.) 255.

It seems to us that the right to exist and do business in corporate form, with the privilege of succession in its membership, without dissolution, the limitation of individual liability and other considerations not enjoyed by individuals, is a very valuable right and should be considered as property. Good reason justifies such construction, eminent judicial authority sanctions it, and we therefore conclude that it is.

 But this conclusion does not wholly solve our problem. It only enables us to say that a franchise "to be" is property. There yet remains the question whether it is *taxable* property. The constitution is equally mandatory that the legislature shall provide a uniform and equal rate of assessment and taxation of property, according to its value *in money;* under such regulation by general law as will secure a just valuation of all property so that each person shall pay a tax in proportion to the value of his property. Our legis-

lature has definitely established as the basis of all property assessment, under a direct property tax, the cash or transfer value of the property. Section 52 of the above chapter 130, Laws of 1925, Ex. Ses., p. 259, Rem. Rev. Stat., § 11135, requires that all property shall be assessed at fifty per cent of its true and fair value *in money*. The true cash value of property is defined as that value at which the property would be taken in payment of a just debt from a solvent debtor. *National Lumber & Mfg. Co. v. Chehalis County,* 86 Wash. 483 (486), 150 Pac. 1164.

This presupposes an ability to sell or transfer. But the franchise "to be," whether it belongs to the corporation or to its incorporators, can not be sold or transferred, nor levied upon nor subjected to the payment of debts. *Memphis & L. R. R. Co. v. Railroad Commissioners,* 112 U. S. 609, 29 L. Ed. 837; *Coe v. Columbus etc. R. R. Co.,* 10 Ohio St. 372, 75 Am. Dec. 518; *State v. Western Irrigating Canal Co.,* 40 Kan. 96, 19 Pac. 349, 10 Am. St. 166; *Detroit Citizens St. R. Co. v. Common Council,* 125 Mich. 673, 85 N. W. 96, 86 N. W. 809, 84 Am. St. 589; *Blackrock Copper M. & M. Co. v. Tingey,* 34 Utah 369, 98 Pac. 180; 28 L. R. A. (N. S.) 255; 14 C. J. 217.

In the progress of the trial, it was formally admitted by counsel for appellant that a franchise to exist and do business could not be sold, transferred or assigned except by transfer of the capital stock, and that there was no such thing in this state as the transfer of such franchise separate and apart from what might be done with it by a transfer of the shares of stock.

Some of the cases go to the extent of holding that, unless the thing taxed has cash value, it is not property. We do not care to go to that extent, but simply hold that, if the property has no cash value, it can not be taxed as a separate item.

The record in this case is replete with evidence that the assessor attempted to assess the various franchises upon their cash value, arrived at without adequate or determining principle, or else upon a basis disapproved by this court, as will more fully hereinafter appear. Since there was no sound basis of valuation, it can not stand. In this connection, it is to be said that, while a franchise may not be taxed *eo nomine,* in view of the cash value basis prescribed by the statute, nevertheless such franchises may have worth when taken in connection with other property to which it gives superadded value. In that sense, and to that extent, it is taxable. Cooley on Taxation (4th ed.), §§ 882, 890. We are, of course, speaking with reference to a direct property tax, and are not dealing with a license fee, such as was involved in *Spokane International R. Co. v. State,* 162 Wash. 395, 299 Pac. 362.

The appellant next contends that the court erred in finding the assessments to be arbitrary, in that they were not based on sufficient facts in possession of the assessor or computed by some uniform rule or method. Much argument is devoted to the proposition that the evidence shows an honest attempt on the part of the assessor to fix a correct cash value on the respective franchises.

The statement of facts in the case contains nine hundred pages, which we have endeavored to read with care. There are many declarations therein on the part of the assessing officers to the effect that they used their best and honest judgment in estimating the value of the franchises, thus bringing them within the rule prescribed by this court as marking the limit of their duty. But it is likewise apparent from the record that their estimates were extremely speculative, largely arbitrary, and, at most, but guesses. While, as to the respondent banks, the assessments in each instance

were made upon the capital stock, it is perfectly apparent that the result was merely a derivative of an assessment laid directly upon the franchise. In fact, Mr. Colburn himself testified that the intention and plan was to separate the one item consisting of the franchise which the corporation had received from the state, and to tax it separately and alone as a piece of property. If there was any certainty of basis at all upon which the judgment of the assessor rested, it came about from a capitalization of the earnings of the respective respondents.

In any event, the whole conception of the taxing authorities, as indicated in appellant's brief and fully substantiated by the evidence, was to tax the franchises direct as separate items. Having already determined that this may not be done, it becomes immaterial whether the method employed was arbitrary or not. The procedure in any event produced a result that was wholly ineffectual.

The appellant next assigns as error the holding of the court to the effect that the proper method of reassessing bank stock, as laid down in *Spokane & Eastern Trust Co. v. Spokane County,* 153 Wash. 332, 280 Pac. 3, was not followed in the instant cases. As herein already stated, that case specifically held that, in determining the value to be placed upon bank stock for taxation purposes, non-taxable securities could not be taken into consideration. That proposition is firmly established as a rule of law in this state.

Again we refer to the evidence in the cases before us. Aside from the fact that the assessor was attempting fundamentally to tax the primary franchises directly, the record abundantly shows that the bank stock was valued as a whole without reference to what was exempt. Mr. Arthur Wadham, the deputy who

had active charge of the assessments, testified as follows:

" . . . I am simply saying that in making up your value of the stock you did not eliminate from consideration the items which the Supreme Court had said are exempt from taxation in this state? A. No, I did not exempt them from consideration. I think that is correct. Q. And you gave them such consideration as their actual or nominal value, as understood by you, entitled them to, did you not? A. Yes. Q. Exactly, that is what I am getting at. And thus, in other words, what you did was to form your value of the stock as a whole without reference to what was exempt from taxation or what was not, did you not? A. I think that is right. Q. Yes. You understood from your legal counsellor that you were entitled to do that? A. That is my understanding. Q. And you did that with reference to each and all of the banks? A. Yes, sir. Q. You valued them on the whole of their assets and the whole of their liabilities? A. Yes, sir. Q. And then, after you had done that and had reached a value that you thought was the value of the stock, you deducted from that value the taxable value of the real estate or at least one-half of the value? · A. That is right. Q. And you made no other deduction from that? A. No, sir. Q. And the result that you reached by that was your judgment of the market value of that stock? A. Of course, you understand that the assets and liabilities were not all the factors that entered into the value of the stock. Q. Doubtless not, as you say, the prestige and reputation of the concern entered into the value of the stock in some sense? A. Yes, sir. Q. But at all events, the assets and the liabilities, whatever they were, you took into full account, each and all of them, without discrimination as to one or another? A. Yes, sir, I analyzed them. Q. And that was the angle from which you approached it—the different angle, I mean? A. Yes, sir, these assets along with other factors."

Mr. Joseph Stewart, the assessor, corroborated Mr. Wadham. The procedure and practice of the assessor

clearly invaded the inhibition pronounced by the court in the *Spokane & Eastern Trust Co.* case. The action of the assessor need not be impugned or disparaged as an attempt to circumvent the decision in that case. Nevertheless, it was in direct and open, though honest, opposition to it. In measuring the value of the stock, there was included the very things that were required by that decision to be eliminated.

It is our opinion that, in assessing the bank stock, the assessor approached the matter from the wrong angle. He endeavored to arrive at the true value of the stock by defining and evaluating the various elements and component parts that made up the whole. It was a selective process, and one, therefore, attendant with the risk of being imperfect or incomplete. The simpler and more exact or accurate method, and the one which we think is to be deduced from the provisions of the statute and the reasoning of our recent decisions, would be to first determine the fair cash value of the stock as a whole and then to deduct therefrom the value of the real estate plus those things which the statute and our decisions declare must be deducted. What is left after the process of subtraction is completed, is properly taxable. What that will be, we do not presume to say. We must leave that to the industry, acumen and honest judgment of the assessor, acting in accordance with the rules prescribed by the legislature.

Appellant's next assignment of error is that the court erred in holding savings and loan associations to be exempt from the tax imposed. Rem. Rev. Stat., §§ 3716 to 3748, inclusive, provides for the incorporation of savings and loan associations and prescribes their powers. Section 3732 reads:

"Shares held by members shall be exempt from taxation and the association itself shall not be taxable,

except that its tangible personal and real property shall be taxed as other tangible personal and real property is taxed.''

Section 3733 provides for a graduated excise tax based upon the amount of assets of the particular association. It is admitted that this tax or fee was paid by each of the respondent associations. Appellant contends that § 3732 was by implication repealed by chapter 130, Laws of 1925, Ex. Ses., p. 227, Rem. Rev. Stat., §§ 11105 *et seq.* This contention is based upon the assertion that that chapter purports to cover the whole field of taxation, specifies what property shall be exempt without designating savings and loan societies, and that therefore the implication must arise that § 3732 was intended to be repealed.

While the language of the 1925 act is quite comprehensive, we do not think that it destroyed the exemption theretofore specifically given to savings and loan associations, under § 3732. Repeals by implication are not favored. *State ex rel. Flick v. Superior Court,* 144 Wash. 124, 257 Pac. 231. A general statute does not repeal a special one, unless such is the plain legislative intent, even when their provisions are somewhat inconsistent. In this case, the act of 1925 specifically repealed a number of statutes, giving reference to their positions in the session laws and to sections of the code, but did not enumerate § 3732 among the repealed sections or acts. If any inference is to be indulged, it must be that there was no intention to repeal § 3732. *State ex rel. Abbott v. Ross,* 62 Wash. 82, 113 Pac. 273.

■ Appellant also contends, under this assignment, that § 3732 is unconstitutional, under the doctrine announced in *State ex rel. Chamberlin v. Daniel,* 17 Wash. 111, 49 Pac. 243. That case, however, held that the exemption proviso of Art. VII, § 2, of the constitution was broad enough to include property of a quasi-public

nature, such as charitable institutions, public libraries, cemeteries and similar classes of property. While savings and loan associations do not fall directly within the general classification of these latter institutions, they are, nevertheless, of a quasi-public nature, and it does not admit of fair doubt that they may be lawfully exempted. In making provision for the creation of these associations, it was the evident intent of the legislature to promote the general public welfare by encouraging industry and thrift on the part of people of small or limited means. To promote that object, it was necessary to effect a character of organization such as these in order to accumulate the savings of small depositors and devote them to restricted forms of investment which, in their design, would assure safety and a fair return. The essential purpose of these associations is mutuality.

Many courts have had occasion to consider and comment upon the nature of these institutions and the wisdom of the legislature in exempting them from taxation. *Gunkle v. Killingsworth,* 118 Kan. 154, 233 Pac. 803; *In re Puget Sound Savings & Loan Ass'n,* 49 Fed. (2d) 922; *Louisville Gas & Electric Co. v. Coleman,* 277 U. S. 32; *Davenport Nat. Bank v. Davenport,* 123 U. S. 83; *Bank of Redemption v. Boston,* 125 U. S. 60; *Consolidated National Bank v. Pima County,* 5 Ariz. 142, 48 Pac. 291; *Mercantile Bank v. New York,* 121 U. S. 138. Nor does the mere fact that the association may loan its money to non-members rob it of its quality of mutuality. *Central Building Loan & Savings Co. v. Bowland,* 216 Fed. 526; *U. S. v. Cambridge Loan & Building Co.,* 278 U. S. 55.

If experience and observation disclose that these associations have departed from their moorings and have embarked upon a course which strips them of their privileged character, then it is for the legislature

to classify them according to their proper nomenclature, and to extend to them just such measure of exemption as the circumstances seem to warrant. It is not for us to qualify that privilege so long as reasonable grounds for its maintenance appear to exist.

Appellant, in its final assignment, contends that the court erred in holding that some of the consent decrees, entered in the former bank cases involving 1928 taxes, were *res adjudicata* herein. As we read the record, this contention affects only four of the respondents, namely, Bank of Fairfield, Washington Trust Company, Elk State Bank and Wall Street State Bank.

As we have already stated in the early part of this opinion, when the decision in the case of *Spokane & Eastern Trust Co. v. Spokane County,* 153 Wash. 332, 280 Pac. 3, came down on August 9, 1929, there were pending in the superior court for Spokane county a number of cases in which the same issues were involved. Knowing that it would be useless to further prosecute those actions, the prosecuting attorney of that county consented to the entry of decrees nullifying the taxes therein sought to be recovered, and which had been paid under protest, and granting to the respective plaintiffs judgment for the amounts paid by them, less the amount found by the court to be the legal taxes owing by each.

The pleadings and judgments in those actions were introduced as evidence and filed as exhibits in these cases, and they plainly disclose that these respondents were therein waging their attack upon the illegality of the tax, and not upon a mere over-assessment. The evidence further discloses that these respondents were there offering to pay the tax upon the basis of the value of their tangible personal property, such as office furniture and fixtures, and were asserting that that was the only basis upon which they could be com-

pelled to pay. Further, the evidence discloses that, by the decrees in those actions, they were required to pay only on that basis.

For emphasis, we repeat the statement that the assessments against the capital stock were therein held to be illegal and void simply because of the decision in the *Spokane & Eastern Trust Co.* case, *supra,* and that the respondents were therefore required to pay taxes only on the tangible personal property above described. A reading of the record convinces us that it was intended by the prosecutor, and well understood by the respondents and so acted upon, that those decrees were simply adjudicating the illegality of the tax on the basis of the assessments as actually made, and were not adjudicating that no tax beyond the amount paid could be levied, if done legally.

In the recent case of *Home State Bank of Blaine v. Whatcom County,* 169 Wash. 486, 14 P. (2d) 21, affirmed on rehearing February 3, 1933 (171 Wash. 702, 18 P. (2d) 1119), we had occasion to examine and analyze the statutes bearing upon the taxation of bank stock, namely, §§ 28 to 32 (Rem. Rev. Stat., §§ 11151 to 11155) and § 108, chapter 130, Laws of 1925, Ex. Ses.; chapter 290, Laws of 1927, p. 710 (Rem. Rev. Stat., § 11269); and chapter 151, Laws of 1929, p. 380, and the effect of the last two acts upon the first. We said, on pp. 492 and 493 of that opinion:

"It seems to us that § 108 of the act of 1925, and its successor, chapter 290, Laws of 1927, p. 710, evidence a legislative intent to provide for a reassessing and retaxing of property which has been assessed and taxed in some irregular or illegal manner rendering the tax uncollectible, and has no reference to property omitted from assessment. Section 108 of the act of 1925, we have seen, was superseded by the act of 1927, which latter act was of the same general import, but some-

what more elaborate in its provisions. The latter has not been repealed or changed, and, like the former, contemplates reassessment and retaxing in the manner by law provided for the original assessing and taxing. This, manifestly, means that shares of capital stock of banks are to be reassessed and retaxed, when occasion requires, as provided by §§ 28-32 of the act of 1925.

"It is argued that those sections, providing for the taxation of shares of capital stock of banks, have been repealed by § 39 of the act of 1929, which act provides for the taxation of banks measured by their income. It seems to us that the proviso of that repealing section saves and continues in force those sections for the purpose of reassessing and retaxing shares of capital stock of banks escaping taxation prior to 1929."

See, also, *Pullman State Bank v. Whitman County,* 172 Wash. 701, 20 P. (2d) 1119.

■■■ But even if the act of 1929 had not, by the proviso in § 39 thereof, saved and continued in full force §§ 28 to 32 of the act of 1925, which the opinion in the *Home State Bank of Blaine* case expressly says that it did, the 1929 act would, nevertheless, be without effect upon the 1925 act, because subsequently, in three cases, the 1929 act was held to be unconstitutional and void. *Aberdeen Savings & Loan Ass'n v. Chase,* 157 Wash. 351, 289 Pac. 536, 290 Pac. 697, 71 A. L. R. 232; *Burr, Conrad & Broom v. Chase,* 157 Wash. 393, 289 Pac. 551; and *Corwin Investment Co. v. White,* 166 Wash. 195, 6 P. (2d) 607.

We are clearly of the view that §§ 28 to 32, inclusive, act of 1925, are still in force with reference to the assessments involved herein. We therefore hold that the consent decrees in the former actions are not *res adjudicata* here.

■■■ It is intimated in appellant's brief that our former decisions hereinabove referred to have left the

taxing officials in doubt as to how to proceed; and the procedure followed by them in the present cases indicates, at least, that they were honestly attempting to follow what they deemed to be the proper construction of those decisions. It may be that, despite the length of this opinion, or possibly because of it, some doubt may still remain, upon one point, at least. There may be others of which we are not aware. With reference to assessing banks for the year 1928, it is probably pertinent, therefore, now to inquire whether their tangible personal property should be assessed and taxed directly as other personal property, or whether it should be included as a part of the value of the capital stock; and further, if the latter method be adopted, what deductions, if any, are allowable.

We think that the first question has been answered in the case of *Home State Bank of Blaine v. Whatcom County, supra,* and the case of *Pullman State Bank v. Whitman County, supra,* to the effect that the proper method of taxing banks for 1928 is the share-tax method. The banks would, of course, be entitled to credit for any amounts that they have already paid for 1928 taxes.

As to the second question, we have endeavored to answer that also in the earlier part of this opinion. It is our view that the fair cash market value of the stock is to be first determined, and from it must be deducted not only the value of the real estate, but also the value of the non-taxable securities or credits enumerated in Rem. Rev. Stat., § 11109, and referred to in the *Spokane & Eastern Trust Co.* case. The remainder will represent the taxable value of the stock. Such remainder should, at least, represent the value of the tangible personal property. Whether it will represent more,

will depend, of course, upon what the fair cash value of the stock, unaffected by any deductions, actually is. The judgment is affirmed.

BEALS, C. J., TOLMAN, HOLCOMB, MITCHELL, MILLARD, and MAIN, JJ., concur.

