[No. 32858-5-II.   Division Two.   July 25, 2006.]

SAVE COLUMBIA CREDIT UNION COMMITTEE ET AL., *Appellants*, v. COLUMBIA COMMUNITY CREDIT UNION ET AL., *Respondents*.

---

176

*Douglas A. Schafer* (of *Schafer Law Firm*), for appellants.

*Heather K. Cavanaugh* (of *Miller Nash, L.L.P.*) (*John F. Neupert*, of counsel), for respondents.

¶1 ARMSTRONG, J. — Save Columbia Credit Union Committee (Save CU) appeals a summary judgment and CR 12(b)(6) order dismissing its claims against Columbia Community Credit Union (Columbia) and individual Columbia board members. Save CU is a nonprofit corporation composed of Columbia members who opposed the credit union's proposed conversion into a mutual savings bank. Save CU claimed that (1) some of Columbia's directors were illegally serving on the board of directors, (2) the directors breached their fiduciary duties to the credit union members, (3) Columbia wrongfully denied credit union members access to credit union records, (4) no law permits a credit union to convert into a mutual savings bank, and (5) any conversion to any other corporate form would require a two-thirds majority vote from the voting members. Because the question of whether board members were serving illegally turns on the meaning of a Columbia bylaw that is not clear on its face, the trial court erred in dismissing this claim; accordingly, we reverse and remand for further proceedings on this issue. The remaining issues bear on Columbia's proposed conversion. We decline to address these issues because Columbia is no longer seeking to convert. We also deny Save CU's request for attorney fees.

## FACTS

¶2 Columbia is a state-chartered credit union under chapter 31.12 RCW. Respondents Karen Martel, Edwin C. Bell, Dale Magers, William F. Byrd III, Robert M. Byrd, Dennis McLachlan, Mark L. Ail, Connie Jones, and Bruce Davidson were members of Columbia's board of directors (Board) in early 2004.[1]

¶3 The Board adopted a plan to convert Columbia into a Washington mutual savings bank. Columbia provided a disclosure statement to its nearly 60,000 members that (1) described the proposed conversion, (2) provided reasons for the proposed conversion, (3) acknowledged that the conversion approval required a majority vote, and (4) recommended that Columbia's members vote "for" the proposed conversion. Clerk's Papers (CP) at 179. At a special meeting held to vote on the proposed conversion, 4,821 members voted for the conversion and 4,407 opposed the conversion, a 52 percent approval.

¶4 Columbia's federal regulator, the National Credit Union Administration, denied the conversion because it disapproved of the voting method. As a result, the administration advised Columbia that its members would have to revote on the proposed conversion.

¶5 Dissatisfied with Columbia's conversion plan, Save CU collected 3,593 signatures from Columbia members and petitioned Columbia to hold a special meeting for its members to vote on the removal of its directors. Columbia deemed the petition unacceptable and failed to act on Save CU's request. Save CU then applied for a writ of mandamus, which the trial court granted in part. In compliance with the order, Columbia prepared and mailed ballots to its nearly 60,000 members to vote on whether to retain the current Board.

---

[1] Of the early 2004 directors, only Mark Ail and Robert Byrd remain on Columbia's Board. Edwin C. Bell, William Byrd III, Dennis McLachlan, and Bruce Davidson lost directorship in an election held at Columbia's annual meeting in September 2004. Connie Jones declined to seek reelection and Karen Martel resigned.

¶6 Columbia and the Board spent "tens of thousands of dollars in expenses associated with conducting the Special Meeting." CP at 126. They also spent undisclosed amounts of money on an extensive advertising campaign, encouraging Columbia members to retain the current directors. Ultimately, the directors all retained office by receiving between 51 and 53 percent of the votes cast.

¶7 Save CU filed this action several days before Columbia and its directors held the special meeting. Save CU alleged that (1) certain directors were serving in violation of Columbia's term limits bylaw, (2) the directors violated their fiduciary duty to Columbia's members by spending Columbia's funds to defend their positions, (3) Columbia wrongfully denied Save CU members access to Columbia records, and (4) Columbia's proposed conversion was illegal.

¶8 The trial court granted Columbia's motion for summary judgment on the term limits claim, ruling that the bylaw in question, which Save CU argued mandated removal of certain directors, applied prospectively and allowed incumbent directors to retain their positions on the Board. The court ultimately also granted Columbia's CR 12(b)(6) motion on the remaining claims.

## ANALYSIS

### I. The Term Limits Claim

*1. Standard of Review*

¶9 We review a summary judgment de novo. *Troxell v. Rainier Pub. Sch. Dist. No. 307*, 154 Wn.2d 345, 350, 111 P.3d 1173 (2005) (citing *Castro v. Stanwood Sch. Dist. No. 401*, 151 Wn.2d 221, 224, 86 P.3d 1166 (2004)). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). Contract interpretation is a question of law only if

"(1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996) (citing *Scott Galvanizing, Inc. v. Nw. Enviroservices, Inc.*, 120 Wn.2d 573, 582, 844 P.2d 428 (1993)).

## 2. *Analysis*

¶10 Save CU argues that the trial court erroneously gave significant weight to a former director's understanding of the Board's intention in amending the "term limits" bylaw to the exclusion of the thousands of Columbia members' understanding. Br. of Appellant at 9. Save CU claims that the "term limits" bylaw rendered incumbent directors ineligible for reelection in the special election resulting from the mandamus order. Br. of Appellant at 12. Columbia argues that the Board intended the bylaw to apply prospectively. Columbia also asserts that the evidence it provided and the bylaw's plain language demonstrate that the bylaw was not intended to disqualify the challenged directors.

### A. Admissibility of Extrinsic Evidence

¶11 In interpreting an organization's bylaws, we apply contract law. *Davenport v. Elliott Bay Plywood Machs. Co.*, 30 Wn. App. 152, 154, 632 P.2d 76 (1981). Our purpose in interpreting a contract is to ascertain the parties' intent. *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). In doing so, we give the bylaws' language a fair, reasonable, and sensible construction. *Davenport*, 30 Wn. App. at 154.

¶12 We seek the parties' intent by focusing on the objective manifestations of the agreement rather than on the parties' unexpressed subjective intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005) (citing *Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co. of Seattle*, 62 Wn. App. 593, 602, 815 P.2d 284

(1991)). Under certain circumstances, we may look to the context surrounding an instrument's execution to interpret the parties' intent. *Hearst*, 154 Wn.2d at 502 (citing *Berg*, 115 Wn.2d at 667). Thus, we may consider extrinsic evidence of the circumstances surrounding contract formation, the subsequent acts and conduct of the parties, and the reasonableness of the parties' respective interpretations. *Hearst*, 154 Wn.2d at 502 (citing *Berg*, 115 Wn.2d at 667).[2]

¶13 But we use extrinsic evidence only " 'to determine the meaning of specific words and terms used' " and not " 'to show an intention independent of the instrument' " or to " 'vary, contradict or modify the written word.' " *Hearst*, 154 Wn.2d at 503 (emphasis omitted) (quoting *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999)); *see also Go2Net, Inc. v. CI Host, Inc.*, 115 Wn. App. 73, 84, 60 P.3d 1245 (2003) (evidence of a party's unilateral or subjective intent as to contract's meaning is inadmissible extrinsic evidence). Generally, the parties' subjective intent is irrelevant if we can determine intent from the actual words used. *Hearst*, 154 Wn.2d at 503-04. In 1999, Columbia amended article V, section 2 of its bylaws, which described a director's term of service on the Board. That section previously mandated that each director serve a three-year term with the terms staggered and an equal number of directors elected each year. Current article V, section 2 of Columbia's bylaws, adopted in November 1999, limits the number of consecutive terms a director may serve:

> Section 2. Term of Office. Each Director, upon election, may serve a maximum of three (3) consecutive, three (3) year terms, unless the Director resigns, dies or is removed under this Article. A mandatory absence from the Board of two (2) years is required before a Director can be re-elected to serve another term of office.

---

[2] Interpretation, as distinguished from construction, is the "process by which we ascertain the meaning we will give to the language of the document by examining objective manifestations of the parties' intent." *Hearst*, 154 Wn.2d at 502 n.9 (citing *Berg*, 115 Wn.2d at 663).

CP at 473. RCW 31.12.235(3) provides that "[a] director must meet any qualification requirements set forth in the credit union's bylaws. If a director fails to meet these requirements, the director shall no longer serve as a director."

¶14 Columbia asserts that the bylaw's language implies that a director must first be elected after the bylaw's effective date for his or her tenure to be subjected to the term limit. Save CU agrees that the bylaw is properly applied to an incumbent director at the end of his or her current term. But Save CU argues that when the bylaw applies, it applies based on the actual antecedent facts, including a director's already-served terms. Thus, Save CU argues, those directors who had already served three or more consecutive three-year terms were ineligible for reelection under Columbia's bylaws. Columbia, on the other hand, argues that the director's "nine-year clock" does not start to run until he or she is reelected after his or her current term, regardless of how many terms a director has already served.

¶15 To support its position on summary judgment, Columbia offered affidavits from then Columbia Chief Executive Officer David Doss and his administrative assistant, Kathleen Porter. Doss's affidavit states that "it was our intention that the term-limits would apply prospectively . . . i.e., that the change would take place upon each individual director's next election." CP at 126. He stated that this interpretation of the bylaw was "the only application that made sense because if the bylaw was made operative immediately," one of the directors would have been ineligible to serve. CP at 126. Porter's affidavit and accompanying handwritten notes from the board meeting in which the directors amended the bylaw reflect Doss's statement that the term limits provision was to apply prospectively. Porter's affidavit states that "it was understood by everyone at the meeting that the term-limits provision applied prospectively." CP at 294.

¶16 The Doss and Porter affidavits do not resolve the issue. The parties agree that although the bylaw was

adopted during the incumbent directors' terms, it would not be applied until an individual director came up for election, i.e., prospectively. The question remains whether once the bylaw applied, it "started the clock" on the three consecutive term limits, or whether it applied to disqualify a director who had already served three or more consecutive terms.

¶17 To answer this question, Columbia offers the extrinsic evidence that directors Connie Jones, Robert Byrd, Dennis McLachlan, and William Byrd III ran for reelection without opposition from other directors or credit union members. *See Berg*, 115 Wn.2d at 666-67 (extrinsic evidence includes the subsequent acts and conduct of the parties). Columbia argues that the fact that the members reelected these directors shows that both the Board and the credit union members understood that the "nine-year clock" started to run upon the director's first bid for reelection following the bylaw's adoption. Br. of Resp't at 9.

¶18 The Doss and Porter affidavits, at best, set forth the subjective intents of the board members. And the extrinsic evidence that some directors ran for reelection after the Board amended the bylaw evidences what those directors believed the Board intended in approving the amendment. But such conduct says little, if anything, about what the members (the other parties to the contract) intended to accomplish with the bylaw. As such, Columbia's extrinsic evidence is insufficient to carry the day on summary judgment. We recognize that the search for members' intent may be difficult because it is unlikely that any members participated in the bylaw amendment procedure.[3] Nonetheless, we hold that Columbia's evidence was insufficient to support a summary judgment on the amended bylaw's meaning.

¶19 The critical bylaw phrase is "upon election." The phrase refers either to the director's original election or first

---

[3] Columbia's communications with members about the proposed bylaw and members' responses may provide evidence of members' intent. In addition, the Board's study and discussion of the proposed bylaw may reveal some members' input.

election after the Board passed the bylaw. The parties point to nothing in the bylaws that clarifies the meaning. Moreover, the bylaw adds to the confusion by stating that the three-year three-term limit applies "unless the Director resigns, dies, or is removed under this Article." CP at 473. This language suggests that the *term limit* does not apply to directors who resign, die, or are removed—clearly an unintended meaning.

¶20 Because Columbia did not offer sufficient evidence to prove a prima facie case, the trial court erred in granting summary judgment. *See Payne v. Children's Home Soc'y of Wash.*, 77 Wn. App. 507, 514, 892 P.2d 1102 (1995). And the bylaw language itself lacks sufficient clarity to support a summary judgment for either Columbia or Save CU. Accordingly, we reverse the summary judgment in favor of Columbia and remand for further proceedings on this issue.

B. Judicial Estoppel

¶21 Columbia argues that in addition to the grounds set forth in its brief regarding bylaw interpretation, Save CU is judicially estopped from making its term limits argument. Specifically, Columbia asserts that Save CU's conduct in seeking to compel the Board to hold a special members' meeting, through a mandamus proceeding, directly contradicts Save CU's current position that the directors were illegally in office.

¶22 Columbia essentially claims that Save CU acknowledged the legitimacy of the directors' service on the Board when Save CU brought a mandamus action to require Columbia to hold a special meeting to vote the directors from office. They argue that had some of the directors not lawfully held office, no vote on their removal would have been necessary. Columbia reasons that Save CU's conduct in bringing the mandamus action amounted to an admission that the directors lawfully held their positions. And as a result, Columbia argues that Save CU cannot now assert that the directors were serving as directors in contradiction to Columbia's bylaws.

¶23 The essence of judicial estoppel is that the party to be estopped must be asserting a position that is inconsistent with an earlier position, the party seeking estoppel must have relied on and been misled by the other party's first position, and it must appear unjust to permit the estopped party to change positions. *Falkner v. Foshaug*, 108 Wn. App. 113, 124 n.36, 29 P.3d 771 (2001) (quoting *Raymond v. Ingram*, 47 Wn. App. 781, 785, 737 P.2d 314 (1987)).

¶24 The trial court declined to accept Columbia's judicial estoppel argument, stating:

> I do not agree that Plaintiffs' seeking to compel the Board of Directors to hold, upon proper demand, a special member's meeting is inconsistent with the term limits challenge now brought. Plaintiffs' mandamus action cannot be construed as a judicial admission of the right of challenged directors to hold office, as opposed to a recognition that the challenged directors remained in power until and unless removed.

CP at 310. The trial court's analysis is persuasive. In applying for mandamus, Save CU listed current directors and stated that each were "presently members of the board of directors of [Columbia]." CP at 436. But Save CU does not, by this language, take the position that the challenged board members are properly serving in accordance with the bylaws. Rather, Save CU simply alleged that the board members are in fact serving. Thus, Columbia has not shown that Save CU is asserting inconsistent positions. Moreover, Columbia does not claim that it was misled or that it changed its position because of Save CU's allegation that the board members were serving. Columbia's judicial estoppel claim fails.

## II. THE FIDUCIARY DUTY CLAIM

¶25 Save CU's fiduciary duty claim arises from the events leading up to the court-ordered special meeting to vote on director removal. As a result of the court's order, Columbia's Board ran an extensive advertising

campaign urging credit union members to retain the current board members. The Board used Columbia funds to (1) hire a private company to call Columbia members and remind them of the meeting and suggest that they vote to retain the current board, (2) print numerous advertisements in the local newspaper supporting the current board, and (3) purchase radio advertisements to the same effect.

¶26 As an initial matter, Save CU argues that it has standing to bring this claim because credit union directors, like corporate directors, have fiduciary duties to both the organization and its members.

¶27 Save CU also claims that Columbia's directors breached their fiduciary duties to the members when they attempted to retain the current board. Specifically, they argue that the credit union directors breached those duties by:

> [E]xpending "substantial sums" to campaign against the directors' removal vote by employing their control over the property, employees and resources of Columbia Community Credit Union to prevent Plaintiffs from communicating information about the removal vote to Columbia Community Credit Union members; and by the directors exercising their power and authority to retain their positions and the benefits thereof.

Br. of Appellant at 13.

¶28 The trial court initially denied Columbia's CR 12(b)(6) motion on the fiduciary duty claim. The court ruled that the legislature, in stating that credit union directors owe a fiduciary duty to the credit union, did not intend to eliminate any such duty to its members. In so ruling, the court compared the fiduciary duty set out in RCW 31-.12.267, applicable to credit union directors, to that of corporations, savings and loan associations, and nonprofit corporations. RCW 31.12.267 provides, in pertinent part: "[d]irectors, board officers, and senior operating officers are deemed to stand in a fiduciary relationship to the credit union." The statute does not mention credit union members.

¶29 After both parties moved for reconsideration, the court ruled that Save CU did not have standing to assert a fiduciary duty claim. The trial court's initial finding—that Save CU had standing—relied on a Washington Nonprofit Corporation Act (WNCA or Act), chapter 24.03 RCW, provision allowing members of a nonprofit corporation to assert claims against directors for breaching fiduciary duties. *See* RCW 24.03.040(2).

¶30 On reconsideration, the court considered RCW 24-.03.010, which specifically states that the WNCA applies only to corporations that are organized under the Act or that expressly choose to have the Act apply to their organization. Further, the court noted that RCW 24.03.015 states that "cooperative organizations, and organizations subject to any of the provisions of the banking . . . laws of this state may not be organized under [the WNCA]." CP at 428. Accordingly, the trial court ruled that Save CU did not have standing because the WNCA did not apply and because the Washington State Credit Union Act[4] (WSCUA) does not contain a provision giving credit union members the right to assert derivative claims against the credit union or its directors.

¶31 Save CU now argues that the common law supports its position that credit union directors stand in a fiduciary relationship to both the organization and its members.

1. *Standard of Review*

¶32 When reviewing a CR 12(b)(6) dismissal, we accept the truth of the factual allegations of the complaint. *Woodrome v. Benton County*, 56 Wn. App. 400, 403, 783 P.2d 1102 (1989). Dismissal under CR 12(b)(6) is appropriate only in those cases where the plaintiff cannot prove any set of facts, consistent with the complaint, that would entitle the plaintiff to relief. *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 750, 888 P.2d 147 (1995).

---

[4] Ch. 31.12 RCW.

¶33 CR 12(b)(6) motions should be granted only " 'sparingly and with care.' " *Bravo*, 125 Wn.2d at 750 (quoting *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032, 750 P.2d 254 (1987)). " 'Any hypothetical situation conceivably raised by the complaint defeats a CR 12(b)(6) motion if it is legally sufficient to support plaintiff's claim.' " *Bravo*, 125 Wn.2d at 750 (quoting *Halvorson v. Dahl*, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978)).

2. *Does Save CU Have Standing To Bring the Fiduciary Duty Claim?*

¶34 Save CU argues that it suffered harm (1) in having to bring the mandamus action to compel the special meeting to vote on director removal, (2) in being denied means to communicate with Columbia members concerning the removal vote, and (3) in having to expend substantial sums to counter the advertising and direct solicitation campaign that the directors waged with Columbia's funds. Without pleading a specific injury to any individual or the credit union itself, it argues that since Columbia's directors owed it a duty and since the directors' breach of that duty harmed them, it now has standing to prosecute a claim against the directors. This argument relies on the proposition that Columbia's directors owed a fiduciary duty to Columbia's individual members.

¶35 The WSCUA does not expressly grant credit union members the right to assert a direct claim against a director for breaching a fiduciary duty. *See* ch. 31.12 RCW. But Save CU argues that corporate statutes and case law demonstrate that members have standing to bring claims against their organization's directors. And since RCW 31-.12.015 states that a credit union is a nonprofit corporation, they argue that a credit union's members have standing to bring claims against credit union directors.

¶36 In *State ex rel. Wicks v. Puget Sound Saving & Loan Ass'n*, our Supreme Court recognized a distinction between ordinary corporate shareholders and persons designated as

shareholders under Washington's savings and loan association act. *State ex rel. Wicks v. Puget Sound Sav. & Loan Ass'n*, 8 Wn.2d 599, 602, 113 P.2d 70 (1941). In *Wicks*, certain members of a savings and loan association brought a mandamus action seeking to compel the savings and loan association to allow them access to corporate records. *Wicks*, 8 Wn.2d at 600. The court first noted that savings and loan associations are quasi-public creatures of statute. *Wicks*, 8 Wn.2d at 602 (citing *Bank of Fairfield v. Spokane County*, 173 Wash. 145, 22 P.2d 646 (1933)). The court then reasoned that although savings and loan members are called shareholders, those associations are essentially different in character from ordinary stock companies and the "shareholders" in savings and loan associations are more like depositors than investors. *Wicks*, 8 Wn.2d at 602. The court also pointed out that provisions in the act delegated oversight and control to government officials. *Wicks*, 8 Wn.2d at 603. As a result, it reasoned that those state officers were responsible for protecting savings and loan members and were the people permitted by law to compel disclosure of the savings and loan association's records. *Wicks*, 8 Wn.2d at 603 (quoting *State ex rel. Berger v. Allen*, 186 Wash. 403, 407-08, 58 P.2d 293 (1936)). Accordingly, the court affirmed the trial court's summary judgment dismissal, holding that individual savings and loan members did not have standing to compel an association to give shareholders access to records. *Wicks*, 8 Wn.2d at 604-05.

¶37 Similar to the shareholders in *Wicks*, Save CU's members resemble depositors more than investors. And, like the savings and loan association in *Wicks*, a credit union is a creature of statute. Ch. 31.12 RCW. Further, the WSCUA charges the director of the Department of Financial Institutions (DFI) to "require each credit union to conduct business in compliance with this chapter and may require each credit union to conduct business in compliance with other state and federal laws that apply to credit unions." RCW 31.12.516(1); *see Wicks*, 8 Wn.2d at 603-04 (shareholders of a savings and loan association do not have

standing because the legislature, through statute, placed responsibility of protecting members of a savings and loan association on certain state officers). The act also permits the director of the DFI to remove a credit union director or prohibit that director from participating in the conduct of the affairs of the credit union if the director has committed a violation of the law or engaged in an unsafe or unsound practice that harms the credit union or its share account holders. RCW 31.12.575(1). Thus, the extensive regulatory oversight that the legislature provides for credit unions suggests that the legislature did not intend for individual members to bring actions against a credit union's directors; rather, the legislature contemplated that the DFI director would protect the members' interests. *See Wicks*, 8 Wn.2d at 603 (quoting *Berger*, 186 Wash. at 407-08).

¶38 Furthermore, the legislature's use of language in only one of two similar situations suggests a difference in legislative intent. *Lundberg v. Coleman*, 115 Wn. App. 172, 177, 60 P.3d 595 (2002) (citing *City of Kent v. Beigh*, 145 Wn.2d 33, 45-46, 32 P.3d 258 (2001)). In *Lundberg*, the court held that while the Washington Business Corporation Act (WBCA), Title 23B RCW, explicitly grants to shareholders the right to bring derivative actions on behalf of corporations, the WNCA does not. *Lundberg*, 115 Wn. App. at 177. Accordingly, the court held that under the WNCA, directors of nonprofit corporations cannot bring a derivative action against the corporation. *Lundberg*, 115 Wn. App. at 177.

¶39 Thus, that the legislature included a provision in the WBCA allowing individual shareholders to bring an action against a corporation's directors, whereas the WSCUA contains no such provision, evidences a legislative intent that credit union members have no such right. *See* RCW 23B.07.400; *see also Lundberg*, 115 Wn. App. at 177-78 (citing *State v. Coria*, 105 Wn. App. 51, 59-60, 17 P.3d 1278 (2001)). And where the legislature wanted to incorporate applicable principles and provisions of the WBCA into the WSCUA, it expressly did so. *See* RCW 31.12.402(21), (22).

¶40 Nevertheless, Save CU argues that despite the lack of statutory authority, corporate common law establishes that a credit union's directors owe its members fiduciary duties. But none of the cases that Save CU cites address whether a credit union director owes a fiduciary duty to an individual member.[5]

¶41 We conclude that Save CU lacks standing to bring its fiduciary duty claim.

### III. THE ACCESS TO RECORDS CLAIM

¶42 Save CU argues that the trial court erroneously dismissed Save CU's claim that it should have been granted access to Columbia's bylaws, bylaw amendments, minutes of directors meetings, copies of corporate policies and plans, and "records that enable members to communicate with other members concerning Columbia's corporate affairs."[6] Br. of Appellant at 16.

¶43 No specific provision of the WSCUA addresses member access to credit union records. In *Wicks*, our Supreme Court held that shareholders of à savings and loan association were not entitled to inspect corporate records when the legislature had delegated that authority to the supervisor of the association. *Wicks*, 8 Wn.2d at 604. The court rejected an argument, similar to the one that Save CU makes here, that corporate common law provided savings and loan shareholders with a right to inspect

---

[5] *Tefft v. Schaefer*, 148 Wash. 602, 269 P. 1048 (1928) (corporate trustee occupies a fiduciary relation to the corporation and to each stockholder); *Hudson v. Alaska Airlines, Inc.*, 43 Wn.2d 71, 260 P.2d 321 (1953) (officers and directors stand in a fiduciary relation to the corporation); *State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co.*, 64 Wn.2d 375, 391 P.2d 979 (1964) (corporate directors have fiduciary duties of loyalty to shareholders).

[6] Shortly before Save CU filed a mandamus application seeking to compel the special director election, Columbia and the DFI entered into an agreement stating that Columbia agreed to "make its [b]ylaws reasonably available to members who request a copy." CP at 464. Accordingly, Columbia's members are entitled to access to Columbia's bylaws and bylaw amendments as a matter of right. Columbia's agreement with the DFI does not, however, grant Columbia's members access to the minutes of board meetings relating to bylaw amendments as a right of membership.

corporate records. *Wicks*, 8 Wn.2d at 602. After noting the difference between corporate shareholders and savings and loan shareholders, and that the legislature provided extensive regulatory oversight in the savings and loan association act, the court held that the rule allowing corporate shareholder access to corporate records "is not applicable to shareholders in savings and loan associations." *Wicks*, 8 Wn.2d at 602.

¶44 Columbia's members resemble depositors at a bank more than corporate shareholders. *See Wicks*, 8 Wn.2d at 602 (although members of savings and loan associations are called shareholders, they are more like depositors than investors in corporate stock). Accordingly, they are not entitled to the protections afforded investors who take the risk of investing in corporate stock. Furthermore, RCW 31-.12.545(2)(a) provides that the DFI director "[s]hall have full access to the credit union's books and records and files, including but not limited to computer files." *See also* RCW 31.12.545(4)(b) (the director may issue subpoenas to and require the attendance and testimony of any person at any place within this state and require witnesses to produce any books and records and files, including but not limited to computer files). These powers are similar to the regulatory oversight powers granted to the supervisor of savings and loan as noted by *Wicks*. Accordingly, we apply the *Wicks* analysis. The state's extensive regulatory oversight of Columbia, coupled with the fundamental differences between shareholders of a corporation and members in a credit union, compels the conclusion that Columbia's members do not have the right to inspect the organization's books and records.[7] *See Wicks*, 8 Wn.2d at 602-04. Thus, the trial court did not err in dismissing Save CU's access to records claim, insofar as that claim related to records other than bylaws or amended bylaws.

¶45 Reversed and remanded on the directors' terms issue. Affirmed on all other issues.

---

[7] This discussion applies to Save CU's members' rights solely as Columbia members. It does not apply to their discovery rights as plaintiffs in this action.

¶46 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, J., concurs.

¶47 QUINN-BRINTNALL, C.J. (concurring in part and dissenting in part) — I join sections I and II of the majority opinion addressing Save Columbia Credit Union Committee's (Save CU) term limit and fiduciary duty claims and agree that the conversion is not a justiciable claim for our review.

¶48 But I respectfully dissent from section III of the majority opinion holding that the trial court properly dismissed Save CU's claim that it was wrongly denied access to Columbia Community Credit Union's (Columbia) records.

¶49 Columbia bylaws require members to comply with its bylaws in order to maintain credit union membership.

¶50 Article II of the bylaws to which Save CU was denied access addressed qualification for membership. Sections 1, 4, 5, and 6 provide the following:

Section 1: membership at the Credit Union is limited to those entities listed in the Field of Membership Appendix and allowed for amendment without regulating approval;[8]

Section 4: a member must maintain at least one share in the Credit Union;

---

[8] Article II, section 1 of the bylaws states:

The Appendix may be amended in order to add groups to the Credit Union's field of membership . . . . All amendments expanding the Credit Union's field of membership shall be submitted for regulatory approval before new groups may be served by the Credit Union. Columbia adopts the enabling amendment pursuant to State of Washington, Department of Financial Institutions, [former] WAC 419-72-041 [1995], streamlined procedure for Small Occupational Groups . . . , as listed in the Field of Membership Appendix to the Bylaws of Columbia Community Credit Union. Such streamlined amendments to the Bylaws do not require regulatory approval before the new groups may be served by the Credit Union.

Clerk's Papers at 469.

Section 5 sets out duties of membership. These duties include "comply in accordance with the law and these bylaws," Clerk's Papers (CP) at 470, and

Section 6 states that the Credit Union may expel a member for cause immediately and defines "failing to comply with the member duties" as one potential "cause" for expulsion. CP at 470.

¶51 Because these bylaws required members' compliance in order to maintain membership, members were entitled to know what the bylaws contained. Thus, they were entitled to copies of the bylaws, bylaw amendments, and minutes of directors meetings relating to amendments of the bylaws. The majority notes that shortly before Save CU filed its mandamus application, Columbia and the Department of Financial Institutions (DFI) agreed that Columbia would " 'make its [b]ylaws reasonably available to members who request a copy.' " Majority at 192 n.6 (alteration in original) (quoting CP at 464). Although this agreement provided some member access to Columbia bylaw documents, it does not ensure all members access to bylaws setting membership requirements. The DFI/Columbia agreement is inadequate because it does not provide a means by which members may receive notice of bylaw changes affecting membership requirements in order that they may request copies.[9]

¶52 I would reverse the trial court's dismissal of Save CU's access to records claim and remand for further proceedings including a determination of whether obtaining access to these records conferred a substantial benefit on credit union members and entitles them to recover attorney fees expended to gain access to the bylaws and records with which they are required to comply.

Reconsideration denied August 24, 2006.

---

[9] *State ex rel. Wicks v. Puget Sound Savings & Loan Ass'n*, 8 Wn.2d 599, 113 P.2d 70 (1941), notwithstanding, since 1996, the National Credit Union Administration (NCUA) has taken the position that member access to credit union records should be the same as shareholder access to similar records in for-profit corporations. NCUA, OGC Legal Op. 96-0541 (June 14, 1996).